[Nos. A078387, A080685. First Dist., Div. Four. June 10, 1999.]

SIERRA CLUB FOUNDATION, Plaintiff and Respondent, v.
RAY A. GRAHAM III, Defendant and Appellant.

1136

**COUNSEL**

Orrick, Herrington & Sutcliffe, Barbara A. Caulfield, Myra J. Pasek, Mary Pat Dooley; Larson & Burnham, Peter Dixon and Barry Zoller for Defendant and Appellant.

Tom Udall, Attorney General (New Mexico), and Frederic S. Nathan, Jr., Assistant Attorney General, as Amici Curiae on behalf of Defendant and Appellant.

Lawrence L. Curtice; Law Offices of Peter J. Adang and Peter J. Adang for Plaintiff and Respondent.

OPINION

**REARDON. J.**—This case has a hint of the "stranger than fiction" flavor: Foundation sues former substantial donor for malicious prosecution based on the donor's fruitless federal suit against the foundation for fraud, breach of contract and other causes. The donor urges attorneys general from two states to get involved. One declines but the other launches an accounting action against the foundation in which a purported beneficiary of the donor's gift intervenes; this action settles.

This appeal—from a judgment for compensatory and punitive damages in favor of the foundation—probes all aspects of the malicious prosecution tort, as well as the constitutionality of punitive damages. It poses the interesting question of where to focus inquiry into whether the underlying action terminated favorably to the foundation—on the federal judgment, or the subsequent settlement in the accounting and related intervention action? We conclude the federal judgment is the proper focus, find the donor's other arguments to be without merit and affirm the judgment but reverse an order for sanctions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Mudd Deed of Gift; Frontera; Land Project*

Established in 1960, respondent Sierra Club Foundation (Foundation) is a California nonprofit corporation, organized as a charitable organization under the Internal Revenue Code. Operating as a separate entity from the Sierra Club, the Foundation's mission is to administer and disburse donated funds for broad charitable and environmental purposes.

In 1970, environmental activist Harvey Mudd executed an agreement with the Foundation called "Deed of Gift (Restricted)" which created the Frontera Del Norte Fund (Frontera) for purposes of financing conservation projects primarily located in New Mexico. The deed of gift called for Mudd to establish a committee to propose conservation projects for funding to the Foundation's board of trustees. He initially donated $130,067 to Frontera, with $100,000 treated as an endowment and the remainder passed to the granting fund to be disbursed for projects.[1]

At that time, Frontera was primarily focusing its activities on air pollution. Mudd was also interested in purchasing a large tract of high mountain land

---

[1]Through 1983 Mudd donated a total of $273,513 to the Foundation, most for Frontera. Between 1970 and 1993 Frontera raised and disbursed over $1.3 million for various projects, including an air and water quality study, a health coop, and wilderness protection projects.

for multiple uses. The idea for this "Land Project" was to identify land with some unique environmental qualities, save it from the developers and use it for a variety of activities including recreation for "barrio" children; scientific research in partnership with one or more universities; and limited livestock grazing if grazing could be accomplished conscientiously. In connection with the land project, discussions were held with La Cooperativa Agricola del Pueblo de Tierra Amarillo (La Cooperativa) about grazing opportunities for their membership. In July 1970 Mudd looked at some properties, but Frontera did not have enough money to proceed with a purchase.

B. *Graham's Donation; Status of Land Project*

Through their involvement in New Mexico Citizens for Clean Air and Water, appellant Ray A. Graham III and his wife met Mudd around this time. Graham had a reputation as a conscientious developer. Mudd spoke with Graham about all of Frontera's activities, including the land project, and showed him a "topo" map and some photographs.

Graham later expressed an interest in donating to Frontera. He sought assurance that his donation would be tax deductible. On November 11, 1970, Graham transferred stock to the Foundation as a gift, for use by Frontera. Neither Mudd nor anyone else represented that Graham's donation would be used for any particular purpose or for any particular beneficiary. Until 1990, Graham never inquired about the status of his donation.

Graham indicated to Mudd that he was making his donation to the project portion rather than the endowment portion of Frontera. Thus it was held in the "granting fund, generally," which was the source of support for Frontera's conservation projects. For accounting purposes of the Foundation, Graham's donation was specifically allocated to the land purchase account and the Frontera committee recommended that it be used for the land project.

The donation was pooled and invested along with other Foundation funds. The interest was used by the Foundation in lieu of an administrative fee, per agreement with Mudd. Thus, no interest accrued to the granting fund. Graham did not ask that interest accrue to his donation, and never discussed the issue.

Throughout the 1970's, Frontera continued to investigate properties for the land project. Brant Calkin, a member of the Frontera committee, looked into more than 57 parcels for the land project. The 2,000-acre "High Mountain Ranch" was a parcel with some potential. With a $200,000 price tag and Graham's gift, Frontera had half the money in the granting fund to

purchase it. There was uncertainty about the location of the water source, but by the time a survey was underway, the sellers took the property off the market. Other properties were examined, but all were problematic for one reason or another: price, title, access, etc. The board of trustees of the Foundation twice gave Mudd authority to bid on property, but its members generally were chary about the Foundation becoming a landowner and managing property.

In 1979 the Foundation asked Frontera if it would release Graham's donation for the general purposes of the Foundation, including support for the Sierra Club. In return, the Foundation proposed to transfer to Frontera $150,000 from a recent bequest restricted to use for land preservation. In January 1980 Graham released the Frontera condition in writing, stating that his contribution could be used "for the general support of the Sierra Club." Calkin told Graham that the Frontera committee would continue to try to find property for the land project, and it did continue looking.

The Foundation did not replace Graham's donation with the bequest until 1989.

C. *Oxbow Incident*

In 1975 the Foundation acquired by gift a 9.825-acre sweetwater cattail marsh on the western edge of Albuquerque called the "Oxbow" marsh. Pursuant to the terms of the gift, the Foundation was to preserve the property in its natural state. Coincidentally, the Oxbow marsh was contiguous to the southern boundary of a large tract of land which Graham purchased in 1968. Graham had the property masterplanned for commercial and residential development. In 1990 the assessed value for tax purposes was $87,500 per acre.

Graham had his property surveyed in 1989. The survey revealed a 1.884-acre boundary overlap with the Oxbow marsh. Graham demanded that the Foundation deed the overlap area to him. His plan was to then deed the area to the City of Albuquerque to resolve a dispute over his development plan. After the parties met with a local title company, the Foundation retained a real estate attorney to render an independent title opinion. That opinion indicated that the Foundation had superior title to the overlap area.

The Foundation decided it could not just deed the overlap area to Graham. Calkin notified Graham of the Foundation's decision as well as the results of the boundary opinion. Graham became very angry, asked about the disposition of his gift and was informed that the Foundation had not yet purchased

any land. He threatened to make trouble about that. Graham then complained to the Sierra Club (not the Foundation) and his senator about the overlap area and the status of his donation. He asked the Sierra Club director for a report on the contribution, its balance and previous uses. The Foundation director responded that the balance had been augmented to $150,000, but interest did not accrue.

By March 1990 Graham's attorneys advised the Foundation that Graham's "two outstanding disputes with the Foundation should be considered together and jointly resolved . . . ." Graham began taking the position that all parties concerned intended his 1970 donation for a specific beneficiary—Ganados del Valle (Ganados). Ganados did not come into existence until January 1984—some 14 years later—although it was founded by some of the same people who started La Cooperativa.

Throughout 1990 the Foundation tried to settle both disputes. In July 1990, attorneys for the Foundation proposed (1) transferring the $270,000 land fund[2] to a suitable donee for use by Ganados; and (2) conveying the Oxbow tract to the City of Albuquerque for its open space program in a transaction whereby Graham would get credit for the overlap area. Graham rejected the first proposal but wanted to separately accept the second and settle the Oxbow incident. Ultimately the Foundation was unwilling to proceed with the Oxbow conveyance "in view of the California litigation" (see below).

### D. *The Federal and New Mexico Litigation*

#### 1. *Procedural Background*

On December 18, 1990, Graham filed suit against the Foundation and Calkin in the United States District Court for the Northern District of California (No. C 90 3595 CAL), praying for individual as well as representative relief on behalf of Ganados. He alleged breach of fiduciary duty, fraud, breach of contract and enforcement of trust, and called for an accounting and declaratory relief.

The following July Graham sought leave to amend the complaint in order to add the attorneys general of New Mexico and California as parties. The court directed that the amended complaint be served on them. The California

---

[2]The history of this fund is confusing. The $150,000 bequest that the Foundation authorized to backfill Graham's contribution following his release accrued interest and appreciated to $268,515 by 1985. At that time, the Foundation made an interest-free loan of those funds to a land conservation organization that was repaid in 1989. As of September 1990 the fund had grown to $296,437.

Attorney General declined to participate but the New Mexico Attorney General indicated he intended to file a parallel civil action in New Mexico rather than intervene. In October 1991 the court stayed the federal action pending that filing.

In December 1991 the Foundation filed a petition pursuant to Probate Code section 17200 for purposes of resolving certain charitable trust issues raised in Graham's complaint. The court granted summary judgment in the Foundation's favor on the ground that the gift did not constitute a trust.

The New Mexico Attorney General filed an action for accounting and other relief in June 1992. The chief attorney on the matter was Fred Nathan, who, just a few months earlier, had been an associate of the firm that represented Graham. Six months later Ganados intervened and filed a complaint in intervention.

In November 1992 the federal district court lifted the stay, dismissed Graham's representative claims as well as individual claims that sought to enforce a charitable trust, all for lack of standing, and granted Graham leave to file a first amended complaint. Thereafter the New Mexico Attorney General and Graham's attorney urged him to exit from the litigation and let the New Mexico Attorney General pursue the case on Ganados's behalf. Ganados's attorney similarly felt that since the objective of the litigation was to "get justice for Ganados," then it should proceed in New Mexico with the New Mexico lawsuit.

Graham opted instead to stay in. In July 1993 he filed a second amended complaint alleging fraud, negligent misrepresentation, breach of contract and breach of covenant of good faith and fair dealing and seeking compensatory and punitive damages for himself alone.[3]

Three months later the federal court granted summary judgment in the Foundation's favor, finding: (1) Graham could not prove essential aspects of his fraud and negligent misrepresentation claims; and (2) Graham had no contract claims because he never entered into a contract with the Foundation; rather, he made a gift which transfers no consideration. Graham noticed an appeal but later withdrew it.

The Foundation settled the New Mexico action two years later, in September 1995. It paid Ganados $900,000 ($500,000 unrestricted, $400,000 for grazing land in New Mexico) and agreed to follow certain management

---

[3]By then Graham's complaint was dismissed as against defendant Calkin.

practices with respect to the Frontera fund.[4] There were releases of liability on the part of the State of New Mexico, Ganados and the Foundation, but the agreement explicitly did not extend to or for the benefit of Graham. The settlement agreement further provided that the Foundation entered the agreement to minimize the cost of continued litigation, not because it was liable. Indeed, it expressly denied liability.

### 2. *Media Strategy*

Shortly before Graham instigated the suit, he told Mudd he was very angry at Calkin and felt he had not been respected or shown sufficient consideration, given his significant contribution to the Foundation. Graham was mad about the Oxbow incident and thought he was entitled to have Frontera surrender the overlap area to him.

Graham admitted he filed the suit to keep pressure on the Foundation. From the beginning, publicity was important to Graham. Part of Graham's game plan was for his attorney, Robert Bouchier, to draft a fact intensive amended complaint in July 1991 that would "allow the media to understand the issues . . . ." The extent to which the media should become involved was a major question, Bouchier asking rhetorically, in an October 1991 memorandum: "How should we attempt to manipulate the media to our advantage?"

That fall Bouchier also met with the officer in charge of the Foundation's special fund-raising campaign marking the 100th anniversary of the Sierra Club. Around the same time, Maria Varela of Ganados wrote to an associate in which she discussed the underlying lawsuit and communications she was having with Graham which included the following: "Graham is adamant that this will go to [trial] before November or he will call the media. SC is preparing for its 100th [centennial] anniversary and a large fundraising push before and during the holidays and would rather see this limp along until after Christmas. If Graham pushes the media button in October if there has been no indication [of] settlement, we will prepare our own media strategy."

The media button was pushed and articles about the lawsuit began appearing in newspapers and magazines around the country as early as October 1991. Quoting from the complaint, these articles bore such headlines as: "Sierra Club Misused $100,000 Donation, Suit Says."

---

[4]Among other things, the accounting firm engaged by the New Mexico Attorney General found that the Foundation failed to: (1) segregate Frontera fund assets as required by the Mudd deed of gift; (2) accrue annual income on Graham's gift, which would have yielded approximately $843,000 between 1970 and 1988; and (3) report Graham's donation to the IRS.

As further detailed in Bouchier's correspondence to Graham in March 1993, the strategy was to "provide factual support for a 'story' which could be researched and used by any interested observers." Bouchier continued: "[T]here are various ways to allow media participation without risking potential liability for instigating the dissemination of false and harmful information. It is Ganados' constituents who have the story with the greater media interest. The entire story can easily be pieced together from court filings and prior articles. . . . Ganados and their constituents are unlikely to be sued successfully for telling their story to the media, even if they actively promote media coverage. Our game plan is simply to let Ganados engage the interest of the media; we then can respond to the media's inquiries with our opinions rather than factual assertions." (Original underscore.)

Graham responded that the "only way" to "the end of the morass is to do something with high profile. Something which brings in the press and lets the generals know they aren't going to escape this one." In June 1993 Bouchier noted that the most difficult aspect of publicity/media relations was to keep the story " 'hot,' " and that the fraud allegations created the best opportunity for favorable publicity.

The negative publicity raised questions in the minds of potential donors and adversely affected the Foundation's ability to raise funds.

## E. *Malicious Prosecution Action*

The Foundation launched its malicious prosecution suit against Graham in November 1994.[5] To prevail, the Foundation had to prove that the prior action, commenced by or at the defendant's direction, (1) terminated favorably as to the plaintiff; (2) was brought without probable cause; and (3) was initiated with malice. (*Crowley* v. *Katleman* (1994) 8 Cal.4th 666, 676 [34 Cal.Rptr.2d 386, 881 P.2d 1083].)

Certain admissions[6] of Graham were brought out at trial, including that at the time of making his donation: (1) he understood that the Frontera committee would determine how to use the funds; (2) no one said that La Cooperativa would be the sole beneficiary and he did not condition his gift on La Cooperativa being the user of any land that was acquired; and (3) he did not condition the donation on acquiring grazing land in Northern New Mexico, or even on a land purchase in Northern New Mexico. Further,

[5]The complaint named Calkin as a plaintiff, but the action was later dismissed as to him. Graham's attorney and his firm were later added as defendants, but they settled.

[6]Per examination under Evidence Code section 776, Graham acknowledged that he made these various admissions under oath in the underlying case.

Graham admitted that prior to making his donation, he never saw the Mudd deed of gift, he asked for no information about it, and the manner in which his and other donated funds would be held or invested was not discussed nor was he told his donation would earn interest. Additionally, he relied on Mudd and Calkin to control his gift, not any particular Frontera committee.

The court determined as a matter of law that the summary judgment entered on Graham's second amended complaint in the federal action constituted a favorable termination for the Foundation. After receipt of the special verdict as well as other evidence offered by Graham solely for the court's consideration, the court determined Graham did not have probable cause to assert, maintain or prosecute the breach of contract, breach of the implied covenant, fraud or negligent misrepresentation claims.

The jury found that Graham acted with malice in commencing and maintaining the underlying action and set the Foundation's compensatory damages at $672,638.07. In the second phase of the trial, the jury assessed punitive damages against Graham in the amount of $2,017,914.21. The parties further stipulated that Graham would pay a portion of the attorney fees and costs incurred by the Foundation in defending Calkin in the underlying action, fixed at $137,895.60. Judgment was entered accordingly.

## II. DISCUSSION

■ Graham reminds us that malicious prosecution has been dubbed a disfavored tort because of its potential chilling effect on the willingness of the ordinary citizen to pursue resolution of disputes in court. (*Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863, 872 [254 Cal.Rptr. 336, 765 P.2d 498] (*Sheldon Appel*).) However, it is equally true that "[t]his convenient phrase should not be employed to defeat a legitimate cause of action. . . . '. . . [W]e should not be led so astray by the notion of a "disfavored" action as to defeat the established rights of the plaintiff by indirection; for example, by inventing new limitations on the substantive right, which are without support in principle or authority . . . .' " (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 53 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878], quoting *Jaffe* v. *Stone* (1941) 18 Cal.2d 146, 159 [114 P.2d 335, 135 A.L.R. 775] (*Jaffe*).)

■ Recognizing the delicate balance that must be struck between these two sentiments, we conclude in this case that the Foundation had a legitimate cause of action and properly proved it. Therefore we reject Graham's premise on appeal that the Foundation failed to properly establish the essential elements of the tort of malicious prosecution: favorable termination, absence of probable cause, and malice.

A. *Favorable Termination*

██ The element of favorable termination is for the court to decide; thus, our review is de novo. (See *Pattiz* v. *Minye* (1998) 61 Cal.App.4th 822, 826-827 [71 Cal.Rptr.2d 802].) It calls for a termination reflecting on the merits of the action and the plaintiff's innocence of the misconduct alleged. (*Lackner* v. *LaCroix* (1979) 25 Cal.3d 747, 750-751 [159 Cal.Rptr. 693, 602 P.2d 393]; *Pattiz* v. *Minye, supra,* 61 Cal.App.4th at pp. 826-827.) When the proceeding terminates other than on the merits, the court must examine the reasons for termination to see if the disposition reflects the opinion of the court or the prosecuting party that the action would not succeed. If resolution of the underlying action leaves a residue of doubt about the plaintiff's innocence or liability, it is not a favorable termination sufficient to support a cause of action for malicious prosecution. (*Id.* at p. 827.)

Favorable termination can occur short of a trial on the merits, but it must bear on the merits. Thus a plaintiff does not establish favorable termination merely by showing that he or she *prevailed* in an underlying action. (*Lackner* v. *LaCroix, supra,* 25 Cal.3d at pp. 750-751.)

1. *Summary Judgment in the Federal Action Was a Favorable Termination*

██ The Foundation prevailed on the merits in the underlying federal action. The summary judgment entered in that action reflects on the Foundation's innocence of the alleged fraud and negligent misrepresentation claims, as established by the following findings rendered by the district court: Graham's fraud and negligent misrepresentation claims were grounded in three misrepresentations: that his gift (1) would be used for purchasing a specific piece of land in New Mexico; (2) was all that was needed to complete the purchase of land; and (3) would be held, invested, accounted for and administered as part of the Frontera fund governed by Mudd's deed of gift. While there was a genuine factual issue as to whether the Foundation made the first representation, Graham did not produce any evidence to support the contention that at the time he made the gift the Foundation did not intend to purchase land. Thus, there could be no fraudulent inducement. As to the second alleged misrepresentation, there was no proof that such representation was made. Further, as to representations concerning the administration of his gift, Graham relied on three letters to establish his understanding of what the Foundation promised regarding use of his money, and there were no misrepresentations in any of them. Finally, the Foundation placed Graham's gift in the Frontera fund and initially treated it as a restricted fund. Moreover, Graham did not produce any

material evidence that the Foundation promised that his donation would be handled in accordance with the Mudd deed of gift, or that he relied on any particular composition of the Frontera committee to safeguard his donation.

The disposition, on the merits, also reflected the court's decision that Graham could not succeed on claims for breach of contract and breach of the covenant of good faith and fair dealing. In particular, the court found that Graham produced no evidence that he entered into a contract with the Foundation. Rather, he made a gift, for which there is no consideration. Thus, there could be no liability on the part of the Foundation to Graham for contract-related causes of action.[7]

Graham tries to use the dismissal of Graham's representative claims as a wedge to dismantle the integrity of the favorable termination ruling. We do not quarrel with his contention that a dismissal or other disposition based on lack of standing is not a favorable termination because it does not shed light on the merits. However, the termination we are concerned with is the summary judgment on Graham's second amended complaint—which was rendered on the merits, and which followed dismissal of Graham's representative claims due to lack of standing.

### 2. *The New Mexico Action Is Not Part of the Favorable Termination Calculus*

The crux of Graham's argument is that the New Mexico action, rather than the underlying action, is dispositive of the favorable termination question. He begins by reminding us that a dismissal following a settlement is not a favorable termination because it reflects ambiguously on the merits, leaving unresolved the issue of the defendant's innocence. (*Pender* v. *Radin* (1994) 23 Cal.App.4th 1807, 1814 [29 Cal.Rptr.2d 36].) Again, we agree with this general proposition, but not with the stretch Graham urges us to embrace. His notion is that "[s]o long as the settlement bears on the underlying dispute and the rights at issue, it is determinative of the favorable termination question"—regardless of whether the plaintiff participated in or

---

[7]Graham makes much of the fact that the federal ruling on the contract theory of recovery left open recovery on a gift theory, which the New Mexico Attorney General pursued. He calls summary judgment on the contract claims procedural circumstances which do not reflect on the merits of Graham's case. Without question the judgment does reflect on the merits of Graham's individual contract case. Graham had no such case and had the option of dropping his federal action once the New Mexico Attorney General stepped into action. He refused to do so.

Interestingly, Graham faults the Foundation for vigorously opposing his attempt to stay the federal action pending outcome of the New Mexico case. But the stay proceedings occurred during the limbo period of late 1991 to February 1992 in which the New Mexico Attorney General presumably was deciding what to do. He did not file an action until June 1992.

was a party to the settlement, and whether or not the settlement was made within the strict confines of the underlying lawsuit.[8]

Next, Graham asserts two related premises: First, under the rationale of *Jaffe, supra,* 18 Cal.2d 146, the New Mexico action marks the final termination of Graham's claims, and that termination was not favorable. Second, his primary right to enforce the 1970 gift for its intended beneficiaries and purpose was incorporated into both the federal and the New Mexico actions, and the latter settlement fails to establish the Foundation's innocence of the claims· asserted in pursuing that right.

■■■ *Jaffe* clarified that to support an action for malicious prosecution, the prior proceeding "must be 'finally terminated'," but it need not be incapable of revival or constitute a bar to further prosecution for the same offense. (*Jaffe, supra,* 18 Cal.2d at p. 152.) The termination in *Jaffe* was the dismissal of a criminal charge for lack of evidence. (*Id.* at p. 150.) In such a case the dismissal indicates the innocence of the accused " 'unless it appears that further proceedings growing out of the same misconduct on [the defendant's] part have been instituted.' " (*Id.* at p. 156.) The Restatement Second of Torts section 660, subdivision (d) is to the same effect: "A termination of criminal proceedings in favor of the accused other than by acquittal is not a sufficient termination to meet the requirements of a cause of action for malicious prosecution if [¶] . . . [¶] (d) new proceedings for the same offense have been properly instituted and have not been terminated in favor of the accused."

Graham urges that the rule of *Jaffe* and section 660, subdivision (d) of the Restatement Second of Torts apply, regardless of whether the underlying action is civil or criminal. First, no case has applied this specific rule to a prior civil proceeding.

Second, the difference between criminal and civil proceedings is patent. When a criminal case is dismissed after a preliminary hearing for lack of evidence, jeopardy does not attach and if further evidence is forthcoming, the criminal defendant can be recharged. The closest analogy in the civil setting would be a judgment of dismissal on demurrer, which would not operate as a bar where the demurrer was sustained for technical or formal as

---

[8]*Oprian* v. *Goldrich, Kest & Associates* (1990) 220 Cal.App.3d 337 [269 Cal.Rptr. 429] is the principal authority cited for this particular proposition. It is inapt. There the malicious prosecution defendants settled their specific performance action with the successor in interest to the malicious prosecution plaintiff. Their remaining action for breach of contract was voluntarily dismissed following reversal of judgment for the malicious prosecution plaintiff on his cross-complaint for fraud. Unlike the instant case, neither disposition was on the merits.

opposed to substantive defects. But that is not our situation. Here we have a final judgment following determination of a motion for summary judgment. That judgment is on the merits and ordinarily, the doctrine of res judicata would preclude subsequent prosecution of a new suit concerning the same alleged wrong.[9] However, if subsequent proceedings are not foreclosed by principles of res judicata, the analysis shifts to defining the nature of the underlying prior action—is it an independent, separate adversarial action, involving the expense and trauma of preparing a response, and having a procedural life of its own? If it is, it will support a later tort claim for malicious prosecution; if instead it is a subsidiary or purely defensive proceeding, it will not. (See *Camarena* v. *Sequoia Ins. Co.* (1987) 190 Cal.App.3d 1089, 1094-1095 [235 Cal.Rptr. 820] [insurer's action for declaratory relief—although related to plaintiff's pending personal injury suit—was sufficiently adversarial and independent to support plaintiff's action against insurer for malicious prosecution]; see also *Merlet* v. *Rizzo* (1998) 64 Cal.App.4th 53, 59-60, 62-63 [75 Cal.Rptr.2d 83].)

Armed with the victory of the federal judgment and its reflection on the Foundation's innocence, the Foundation was free to pursue its malicious prosecution action without regard to the outcome of the New Mexico action. The two proceedings were separate and had separate procedural lives. The plaintiffs were different, as were the courts and the relief sought. The underlying action was adversarial, causing expense and injury to the Foundation. It was not ancillary by any measure to the New Mexico action, nor was it dependent on the outcome of that proceeding. Because the two actions were separate and independent, and because the federal judgment was truly final, the New Mexico settlement does not cast a shadow of ambiguity on the federal judgment in terms of the Foundation's innocence in that action.

Graham also argues that where the underlying action seeks to remedy one primary right—which he purports to be the case here—one must look to the judgment as a whole in deciding whether termination is favorable, rather than parsing the disposition of each separate theory of recovery. (See *Freidberg* v. *Cox* (1987) 197 Cal.App.3d 381, 386-389 [242 Cal.Rptr. 851].) According to Graham, from the inception he sought to enforce only one primary right—that his 1970 gift be used to benefit Ganados—and that right was enforced by the proper parties through settlement of the New Mexico action.

Our Supreme Court in *Crowley* has pointed out that it does not follow from *Friedberg*'s primary right theory that a ruling striking two out of three

---

[9]The Foundation raised the defense of res judicata/collateral estoppel in the New Mexico action, but settled before any decision was rendered as to whether the judgment in the federal action bound the New Mexico Attorney General or Ganados.

theories of liability is not at least a " 'partial favorable termination' " for purposes of malicious prosecution. (*Crowley* v. *Katleman, supra,* 8 Cal.4th at p. 686.) "Whether such a termination is sufficient to support a malicious prosecution action is, again, a question of policy under the substantive law of that tort." (*Ibid.*)

 Stated somewhat differently, the malicious prosecution plaintiff need not demonstrate that the entire underlying proceeding was utterly groundless. Groundless charges coupled maliciously and without probable cause with well-founded causes are no less injurious for the coupling. (*Singleton* v. *Perry* (1955) 45 Cal.2d 489, 497-498 [289 P.2d 794].) Thus, a malicious prosecution plaintiff is not precluded from establishing favorable termination where severable claims are adjudicated in his or her favor. (*Paramount General Hospital Co.* v. *Jay* (1989) 213 Cal.App.3d 360, 369-370 [261 Cal.Rptr. 723].) Graham's individual claims were severable from the claims which the New Mexico Attorney General and Ganados pursued. Indeed, he could not pursue those claims and his attempt to pursue them in a representative capacity failed for lack of standing.

Under *Crowley, Singleton* and *Paramount,* Graham's individual claims— adjudicated in the Foundation's favor—were severable, and that adjudication supports the favorable termination requirement.

## B. *Probable Cause*

 The probable cause element plays an essential role in cutting to the heart or purpose of the tort of malicious prosecution—protection of the individual's interest in freedom from unreasonable and unjustified litigation. This element requires the trial court to make an objective call as to the reasonableness of the defendant's conduct; that is, to determine whether, on the facts known to defendant, institution of the prior action was legally tenable. If the prior action was objectively reasonable, the malicious prosecution claim will fail. (*Sheldon Appel, supra,* 47 Cal.3d at pp. 878-879.)

As well, absence of probable cause can be shown by proof that the initiator commenced the prior action knowing that his or her claims were false. (*Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 50.) Reconciling *Bertero* with the objective test for probable cause, the court in *Sheldon Appel* highlights the distinction between a defendant's subjective belief in the legal tenability of a claim, as opposed to his or her disbelief in its factual predicates. (*Sheldon Appel, supra,* 47 Cal.3d at p. 880.) Probable cause does not depend on the defendant's subjective evaluation of the legal merits of the prior action. But if defendant *knows* that the facts he or she is

asserting are not true, then defendant's knowledge of facts which would justify initiating suit is zero, and probable cause is nonexistent. "A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a legal theory which is untenable under the facts known to him." (*Sangster* v. *Paetkau* (1998) 68 Cal.App.4th 151, 164-165 [80 Cal.Rptr.2d 66].)

The question of probable cause is one of law, but if there is a dispute concerning the defendant's knowledge of facts on which his or her claim is based, the jury must resolve that threshold question. It is then for the court to decide whether the state of defendant's knowledge constitutes an absence of probable cause. (*Sheldon Appel, supra,* 47 Cal.3d at pp. 879-881; *Axline* v. *Saint John's Hospital & Health Center* (1998) 63 Cal.App.4th 907, 917 [74 Cal.Rptr.2d 385].)

█ Based on the jury's answer to interrogatories,[10] the court ruled that Graham did not have probable cause to initiate or maintain the underlying action because he did not have a good faith belief in the truth of its essential factual allegations. Additionally, the court concluded that Graham did not possess facts or information sufficient to render legally tenable the assertion or maintenance of any of his claims for relief.

Graham does not dispute that the jury findings are supported by substantial evidence. They are, as the facts recited in part I certify. However he does make the remarkable statement that the special interrogatories provided "no guidance" to the court in its probable cause analysis. He lists several

---

[10]The jury found that, during the entire course of the underlying action, Graham did not have a good faith belief in 16 out of 17 essential allegations, as follows: (1) and (2): that he was induced to make his gift based on the representation that it would be used solely to acquire grazing land in Northern New Mexico for the use of La Cooperativa, and he made the gift for that purpose; (3) and (4): that he was induced to make his gift on the representation that it would only be dealt with and disposed of pursuant to the Mudd deed of gift, and he made the gift on that basis; (5) and (6): that Graham was induced to make a gift to Frontera based on the representation that the funds would be invested and would accrue interest separately for the benefit of the fund, and he made the gift on that basis; (7) that the January 1980 release of the condition of his donation was temporary; (8) that he continued to inquire into the status of his donation from January 1980 to December 1990; (9) that the Foundation's officers appropriated his funds for their own use and benefit; (10) that he was told his gift was all that was needed to complete the purchase of High Mountain Ranch; (11), (12) and (13) that there were misrepresentations in three letters sent or copied to Graham in the fall of 1970; (14) that in making his gift, Graham relied on the representation that the Frontera committee was composed of three members; (15) that Graham entered into a contract with the Foundation for the Foundation to use his gift solely to acquire grazing land in Northern New Mexico for the use and benefit of La Cooperativa; and (16) at the time the Foundation accepted the gift, it did not intend to use the gift for the benefit of the fund.

The jury did find that Graham had a good faith belief that his gift was to be kept segregated from the general funds of the Foundation until 1980.

reasons: they do not get at his belief in the essential facts of his claims; they suffer from a compound, prolix structure; and some are irrelevant to the probable cause question.

First, Graham did not object to these interrogatories or propose any of his own. In fact, he agreed to the form and content of the special verdict. More to the point, the special interrogatories do frame the factual predicates of Graham's claims for relief in the underlying action, correlating very specifically with the various paragraphs and subparagraphs of the complaint.

Graham further argues that probable cause was established as a matter of law by four "undisputed" facts: (1) he gave $100,000 to the Foundation in 1970; (2) the donation was for the purpose of purchasing land in New Mexico; (3) Graham designated the gift for use by Frontera; and (4) by 1990 the Foundation had not purchased any such land with the donation. It was not.

First, fact number two was in dispute and rejected by the jury.[11]

Second, these facts do not aid establishment of any of the key allegations comprising the Foundation's misconduct, as detailed in Graham's complaint.

Third, as explained above, the jury found, on substantial evidence, that Graham did not believe those allegations to be true. That being the case, there was no factual predicate on which to hang a finding of probable cause.

Graham further argues that certain other "undisputed" facts supported the claims he asserted in the underlying lawsuit and gave rise to a reasonable suspicion that the Foundation did not intend to purchase land in New Mexico

---

[11]Graham's donation letter merely states that his gift was designated for use of the Frontera fund. While Mudd did testify that he discussed the land project with Graham and Graham expressed interest in it, Mudd was clear that he never represented that Graham's gift would only be used to buy land in Northern New Mexico. Graham admitted no one told him his gift would be used for this purpose.

Graham also points to prior testimony of Colburn Wilbur, financial secretary for the Foundation, to the effect that (1) if Graham made a donation, the money would be used for acquiring land in New Mexico; and (2) he remembered Graham's donation was to be used to purchase land and he considered that to be a restriction of the gift. Wilbur made it clear in the instant trial that purchase of land was *one of the options*, that he never talked with Graham about Graham's expectations and to his knowledge Graham never specified that his donation had to be used for buying land and for no other purpose. Further, his recollection about an intent to purchase land was in connection with conversations with "the Frontera del Norte people"—*after* the gift was made—that the donation was "more likely" to be used for that purpose.

Wilbur also stated in the present trial that he did not consider Graham's gift restricted to the purchase of land, but it was restricted to the Frontera fund.

at the time Graham made the donation, as follows: (1) the board of trustees of the Foundation was opposed to the purchase of land; (2) the Foundation provided Graham with inconsistent accountings regarding his gift; (3) the Foundation failed to accrue interest on his gift; (4) the Foundation failed to disclose the donation on its 1970 tax returns;[12] (5) Mudd proposed to establish a retirement fund for Calkin using Frontera funds;[13] and (6) the transaction involving the bequest was not disclosed to Graham or implemented as required by the board of trustees of the Foundation.

To begin with, some members of the board were opposed to the purchase of land, but that does not translate into a blanket policy against land purchase. Indeed, the board gave Frontera authority to make offers on land. And in any event, this does not bear on what promises, if any, were made to Graham. Likewise the interest, tax, accounting and retirement fund issues do not speak to what happened in 1970 when the gift was made or the other essential allegations in the underlying action. With respect to the 1980 bequest and Graham's release, the jury found, from all the evidence, that the release was not, as Graham asserted, temporary. Graham claims the release was obtained under false pretenses because Calkin told him that they would "continue" the land project anyway, while Mudd testified that it was clear at that time that the land project "probably" "was not going to be able to be accomplished." However, he further indicated that Calkin—in effect true to his word—continued to look at land. Moreover, although the bequest was not transferred to the Frontera fund until 1989, it was earmarked for that fund in 1980 and ultimately used to revive it.

Finally, Graham contends that the New Mexico pleadings support a finding of probable cause. The judge and jury were apprised of that action by way of testimony as well as exhibits. That the Foundation settled the action does not boost Graham's claim of probable cause. In the settlement agreement the Foundation expressly denied liability with respect to all allegations.

## C. *Malice*

■ The malice element of the malicious prosecution tort goes to the defendant's subjective intent in initiating the prior action. (*Sheldon Appel*,

---

[12]While the donation was not separately itemized for the 1970 filing, apparently it was included in the amount of total donations reported for that year.

[13]Graham presented evidence on this matter solely to the court, for consideration on the issues of probable cause and unclean hands. In 1987 Mudd approached the Foundation to explore the idea of using funds from Frontera to make some type of individual award to Calkin. The idea would be to retain Calkin in a consulting role or "[p]rofessor emeritus kind of status" as his career in the environmental movement wound down. Nothing came of this proposal.

*supra*, 47 Cal.3d at p. 874; *Axline* v. *Saint John's Hospital & Health Center*, *supra*, 63 Cal.App.4th at p. 917.) It is not limited to actual hostility or ill will toward the plaintiff. Rather, malice is present when proceedings are instituted primarily for an improper purpose. Suits with the hallmark of an improper purpose are those in which: " '. . . (1) the person initiating them does not believe that his claim may be held valid; (2) the proceedings are begun primarily because of hostility or ill will; (3) the proceedings are initiated solely for the purpose of depriving the person against whom they are initiated of a beneficial use of his property; (4) the proceedings are initiated for the purpose of forcing a settlement which has no relation to the merits of the claim.' " (*Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 383 [295 P.2d 405].)

■ The Foundation wove together a theory of malice that incorporated a number of threads: Graham's anger about the Oxbow boundary overlap and his threat to make trouble over his donation; his efforts to bring others—such as a New Mexico senator—into the fray; the adverse media campaign which relied on false fraud accusations to discredit the Foundation and interfere with its fund-raising campaign; and Graham's rejection of the "exit" strategy (dismissing the case and walking away once the New Mexico action was underway). The jury returned a special interrogatory finding that Graham acted with malice in commencing and maintaining the underlying action.

Graham does not complain on appeal that the finding of malice lacks substantial evidence. Rather, he urges that the court abused its discretion in excluding evidence concerning the actual settlement of the New Mexico action. Without knowledge of the outcome of that action, he argues the jury was given the misimpression that the New Mexico proceeding was devoid of merit simply because it was part of Graham's strategy to discredit the Foundation. Graham points to the following selection from the Foundation's closing argument: "[T]he New Mexico Attorney General's action was engineered by Ray Graham. It was engineered for the very purpose that he is using it here today, to try to show that his lawsuit in the underlying case had some credibility, but since it was engineered by him, I don't think it shows that."

The trial court excluded evidence of the actual settlement, which occurred *after* termination of the underlying action, on grounds that it was not relevant to Graham's state of mind in initiating or continuing that action. That ruling was correct. What occurred in the New Mexico proceeding after September 1993 was irrelevant to the issue of Graham's state of mind for purposes of the malicious prosecution action.

Moreover, there was no misimpression. The Foundation had every right to argue that Graham engineered the New Mexico Attorney General's action

given that an associate with the law firm representing Graham joined the Attorney General's office and was assigned to work on the matter. But having argued that, the Foundation went on to *distinguish* Graham's action from the Attorney General's action by tying the malice to Graham's claims of fraud and misrepresentation, as contrasted with the Attorney General's suit for accounting, and further explaining: "So the fact that the New Mexico Attorney General sued for an accounting doesn't tell you that Graham was not malicious when he sued the Foundation for fraud and misrepresentation and misappropriation of funds. [¶] Now, there is another reason . . . why the New Mexico Attorney General's action doesn't lend credibility to Graham's claim that he wasn't malicious. That is because the New Mexico Attorney General, unlike Graham, did not . . . get involved in a media campaign to discredit the Sierra Club Foundation."

### D. *Punitive Damages*

Exemplary damages are available in tort actions "for the sake of example and by way of punishing the defendant" (Civ. Code, § 3294, subd. (a)) upon proof "by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice . . . ." (*Ibid.*)

Instructing the jury for phase I of deliberations, the court cautioned that "the definition of the word 'malice' for purposes of malicious prosecution is different from the definition of the word 'malice' as used for punitive damage purposes. [¶] Each definition of 'malice' should be used only for the purpose for which its use is defined by the court. This means that you should not use the definition of 'malice' as it was defined for malicious prosecution purposes in determining any issue on the question of punitive damages or vice versa."

At the close of these deliberations the jury found, by clear and convincing evidence, that Graham acted with malice. Moving to phase II, the parties stipulated that Graham's net worth was $90 million. The court then advised the jury that it must determine whether to "award punitive damages against defendant Graham for the sake of example and by way of punishment . . . , and if so, the amount thereof is left to your sound discretion, exercised without passion or prejudice." The court further instructed that if the jury decided to assess punitive damages, it should consider the following factors in setting the amount: (1) the reprehensibility of defendant's conduct; (2) the amount of punitive damages that will have a deterrent effect on defendant in light of defendant's financial condition; and (3) that punitive damages must be reasonably related to the injury, harm or damages actually suffered by plaintiff.

Graham levels multiple attacks on the punitive damages award. First, he argues that the jury instructions were "peculiar" and "problematic" because dual malice findings were required to establish the tort and then award punitive damages. He speculates that because the jury was called upon to make two determinations of malice during phase I of deliberations under different evidentiary standards and definitions, it is "likely" the jury made but one determination. In effect, he proposes that the jury disregarded the proper definition and higher evidentiary standard required to impose punitive damages. He complains that the jury should have received guidance on how and why malice for purposes of punitive damages differs from malice for purposes of imposing liability for malicious prosecution.

Our review of the instructions and proceedings demonstrates the speculative quality of Graham's concern. The instructions were proper and clear. The two definitions speak for themselves and the court alerted the jury that the two definitions were distinct, and for different purposes. There is no indication, through juror questions or otherwise, that the jury was confused. The court polled the jurors after each phase of deliberation and not one expressed any doubt or hesitation. We will not presume on appeal that the jury ignored proper instructions on damages. (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 953 [160 Cal.Rptr. 141, 603 P.2d 58].)

Graham persists, arguing that merely providing jury instructions is not enough. Adequate guidance, including guidance on the unusual nature and purposes of punitive damages, is also required, in order to survive a due process challenge. We have no quarrel with the proposition that "general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus." (*Pacific Mutual Life Insurance Co.* v. *Haslip* (1990) 499 U.S. 1, 18 [111 S.Ct. 1032, 1043, 113 L.Ed.2d 1] (*Haslip*).) But what, in law, is the difference between instruction and guidance? Certainly the high court in *Haslip* does not split that hair; nor will we. The court here delivered instructions which guided the jury during deliberations on punitive damages. Those instructions correctly informed the jury of the nature and purpose of punitive damages.

In addition, we fail to see the harm in delivering the nature and purpose instruction during phase II, after the jury rendered its finding of malice for purposes of punitive damages. The misconduct necessary to impose punitive damages—whether it be malice, oppression or fraud—serves as a gatekeeper for punitive damages deliberations. If defendant's conduct is not sufficiently egregious, defendant can avoid the parade of evidence of his or her financial condition. But if the conduct is sufficiently egregious, that is not enough to trigger punitive damages. The sanction must serve a purpose of deterrence

and punishment and if it would not, for whatever reason, there will be no award. This sequencing of instructions and deliberations is appropriate.

Moreover, we are not impressed with Graham's suggestion that when a jury must make two findings of malice, the court should also tell the jury that the punitive damages finding will entail a second phase of deliberation. Graham speculates that with this structure, the jury would "appreciate the context of its deliberations and the higher standard required to prove malice for punitive damages." Again, this argument assumes that the jury fails to properly appreciate and attend to instructions. Given this assumption—which we reject—an adverse result is just as possible. One could just as easily assume that with a second round of decisionmaking before it, the jury might gloss over evidentiary nuances and abdicate heightened scrutiny, figuring it could always withdraw the punitive damages trump card during phase II.

Finally, Graham faults California's punitive damages review procedures.

In *Haslip*, the United States Supreme Court put its lens to Alabama's punitive damages system. Upholding that system, the court noted with approval that in Alabama (1) the court instructs the jury on the nature and purpose of punitive damages and explains that their imposition is not compulsory; (2) the trial court scrutinizes punitive awards on a posttrial challenge to excessiveness of damages according to a number of factors, noting on the record the reasons for upholding or interfering with the verdict; and (3) the state Supreme Court measures the punitive damages verdict against established standards to guard against excessiveness. (*Haslip, supra,* 499 U.S. at pp. 19-22 [111 S.Ct. at pp. 1043-1046].)

Our Supreme Court recently weighed in on the punitive damages debate, holding that a plaintiff must prove a defendant's wealth before punitive damages can be imposed. (*Adams* v. *Murakami* (1991) 54 Cal.3d 105, 123 [284 Cal.Rptr. 318, 813 P.2d 1348].) However, it declined to take the further step of deciding whether California's standards for reviewing punitive damage awards passes constitutional scrutiny after *Haslip*. (*Id.* at pp. 118-119, fn. 9.)

In California, the trial court, sitting as an independent trier of fact, reviews punitive damages awards on a motion for new trial. A new trial may not be granted on the ground of excessive damages "unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (Code Civ. Proc., § 657.)

Appellate review calls for setting aside such an award only when it appears excessive as a matter of law, " ' " " 'or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice.' " ' " (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 927-928 [148 Cal.Rptr. 389, 582 P.2d 980] (*Neal*).) The *Haslip* court expressed some concern with state schemes operating under a similar standard of review. (*Haslip, supra,* 499 U.S. at p. 21, fn. 10 [111 S.Ct. at p. 1045].) By way of contrast, it was comfortable that Alabama's review scheme ensures that a jury's award does not exceed an amount that will accomplish society's twin goals of punishment and deterrence. (*Id.* at p. 21 [111 S.Ct. at p. 1045].)

The court in *Las Palmas Associates* v. *Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220 [1 Cal.Rptr.2d 301] (*Las Palmas*) took up the challenge of deciding whether the California scheme survives *Haslip,* concluding that our posttrial and appellate standards of review are padded with sufficient safeguards to ensure a constitutional result. On a motion for new trial, the trial court can disbelieve witnesses, reweigh evidence and draw reasonable inferences that are contrary to those drawn by the jury.[14] On appeal the reviewing court will intervene if the verdict is so palpably excessive as to raise the presumption of passion and prejudice. (*Las Palmas,* 235 Cal.App.3d at p. 1258.) Moreover, working with that standard we apply the same criteria as the jury, examining the reprehensibility of defendant's misconduct, the proportionality between punitive and compensatory damages, and the relationship between punitive damages and defendant's net worth. (*Neal, supra,* 21 Cal.3d at p. 928; see *Adams* v. *Murakami, supra,* 54 Cal.3d at pp. 110-111; *Las Palmas, supra,* 235 Cal.App.3d at p. 1258.) Finally, because the purpose of punitive damages is to deter future misconduct by the defendant, "the key question before the reviewing court is whether the amount of damages 'exceeds the level necessary to properly punish and deter.' " (*Adams* v. *Murakami, supra,* at p. 110, quoting *Neal, supra,* 21 Cal.3d at p. 928.) And this question must be answered in light of the relevant facts. (*Adams* v. *Murakami, supra,* at p. 110.)

Graham rejects the *Las Palmas* reasoning as deficient in light of the high court's subsequent decision in *BMW of North America, Inc.* v. *Gore* (1996) 517 U.S. 559 [116 S.Ct. 1589, 134 L.Ed.2d 809] (*BMW*). The issue there was

---

[14]As the court in *Las Palmas* pointed out, unlike Alabama, California law does not require the trial court to state on the record why it leaves an award intact, although it must explain any interference with the award. (*Las Palmas, supra,* 235 Cal.App.3d at p. 1258, fn. 8.) A statement of reasons is not constitutionally required for an intact award. (*TXO Production Corp.* v. *Alliance Resources Corp.* (1993) 509 U.S. 443, 464-465 [113 S.Ct. 2711, 2723-2724, 125 L.Ed.2d 366] (*TXO*); *Stevens* v. *Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1657 [57 Cal.Rptr.2d 525].)

whether a $2 million punitive damages award, added to a $4,000 compensatory award, was grossly excessive, and in particular whether the defendant—an out-of-state distributor—had fair notice of the conduct that would subject him to punishment as well as the severity of the penalty that a state can impose. The court identified three guideposts indicative of adequate notice: degree of reprehensibility; ratio of punitive damages to harm/potential harm inflicted on plaintiff; and comparison of punitive damages award to other sanctions for comparable misconduct. (*Id.* at pp. 565, 574-575 [116 S.Ct. at pp. 1593-1594, 1598-1599].)

The first two guideposts find exact matches in California's scheme which requires us to look at the defendant's conduct and the amount of compensatory damages.[15] The third factor can assist a reviewing court in figuring out whether the punitive damages award approaches the point of equilibrium that satisfies but does not exceed the amount necessary to properly punish and deter.

The *BMW* guidelines are just that—they are guidelines which, if not exactly replicated in a state scheme, do not spell constitutional doom. In a proper case, our inquiry into whether there is equilibrium between the penalty and its deterrent and punitive effects would take into account the comparative sanctions question. As our Supreme Court has stated, this inquiry is to be made in light of the relevant facts. There is, of course, nothing in California's procedures which would preclude a defendant from developing facts on comparative sanctions which, in turn, would inform appellate review. However, in this case Graham has not alluded to any comparable civil or criminal penalties for deterring malicious prosecution of a civil lawsuit, nor are we aware of any. While court sanctions are available in many jurisdictions against frivolous claims and delaying tactics (e.g., Code Civ. Proc.,[16] § 128.7), such sanctions are meted out on a pleading-by-pleading and motion-by-motion basis. By their nature they do not address the grander scale of harm inflicted from a lawsuit seen to judgment.

Under either *BMW* or *Neal*, the award was not excessive. The reprehensibility of Graham's conduct can be seen in his own disbelief in the underlying charges; his media strategy to extract settlement on his terms while bringing negative attention to the Foundation during its centennial

---

[15]The high court in *TXO* and *BMW* has refined the disparity analysis to take into account the *potential* loss to plaintiffs, as where a scheme worthy of punitive damages does not fully succeed. In such cases, the proper ratio would be the ratio of punitive damages to the potential harm to plaintiff. (*BMW, supra,* 517 U.S. at pp. 581-583 [116 S.Ct. at pp. 1601-1603]; *TXO, supra,* 509 U.S. at p. 460 [113 S.Ct. at pp. 2721-2722].) This twist helps the plaintiff, not the defendant, and thus does not raise the constitutional ante.

[16]All further statutory references are to the Code of Civil Procedure.

fund-raising campaign; and his vendetta over the Oxbow incident. Proportionality is not a problem—the punitive damages award was three times the compensatory award, not a penny more. (See *Haslip, supra,* 499 U.S. at pp. 23-24 [111 S.Ct. at pp. 1046-1047] [upholding award with greater than four-to-one ratio].) We are not aware of any comparable civil or criminal penalties that could be levied to deter malicious prosecution. Finally the award was more than 2 percent of Graham's net worth, far less than the 10 percent cap generally recognized by our courts. (See *Weeks* v. *Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1166 [74 Cal.Rptr.2d 510].)

### III. The Sanctions Order Against Graham Must Be Reversed

By separate appeal which, on our own motion, we consolidate with the underlying appeal from the judgment, Graham attacks a $6,693 sanctions award levied against him and his counsel. Although the Foundation had sought sanctions pursuant to section 128.5 in connection with Graham's *third* motion for summary judgment, the court in fact awarded sanctions under section 128.7. The Foundation had submitted a proposed order denying Graham's third motion for summary judgment and awarding sanctions under section 128.5. The order was signed, but the paragraph on section 128.5 sanctions was specifically crossed out. The court also entered its own order denying Graham's summary judgment motion and granting sanctions under section 128.7.

■ Without treating the merits of the award, we conclude the court lacked authority to award sanctions under section 128.7. That statute provides: "This section shall apply to a complaint or petition filed on or after January 1, 1995, and any other pleading, written notice of motion, or other similar paper filed in such a matter." (§ 128.7, subd. (i).) The applicability of section 128.7 is determined by the filing date of the original complaint. (*Murphy* v. *Yale Materials Handling Corp.* (1997) 54 Cal.App.4th 619, 623-624 [62 Cal.Rptr.2d 865].) Here, the Foundation filed its complaint in November 1994.

The Foundation argues nonetheless that because they sought sanctions under section 128.5—which applies to proceedings initiated on or before December 31, 1994—we should reverse the sanctions order with directions to the trial court to reconsider its order pursuant to the criteria of that section. This we will not do. The Foundation did not seek reconsideration of the erroneous sanctions ruling at the time, nor did it file a cross-appeal. The only issue legitimately before us is the validity of the sanctions order under section 128.7, which is reversed for being in excess of the court's authority to enter.

We affirm the judgment (No. A080685) and reverse the sanctions order (No. A078387).

Poché, Acting P. J., and Sepulveda, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 29, 1999.