Filed 12/6/13  Du Boise v. Peterson CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| LISA DU BOISE,<br><br>    Plaintiff, Cross-defendant and<br>    Appellant,<br><br>    v.<br><br>ERIC C. PETERSON et al.,<br><br>    Defendants, Cross-defendants and<br>    Respondents;<br><br>RODNEY UNGER,<br><br>    Defendant, Cross-complainant and<br>    Appellant. | B237764 (Consolidated with B240357)<br><br>(Los Angeles County Super. Ct.<br> No. SC111762) |

APPEAL from the orders of the Superior Court of Los Angeles County, Norman P. Tarle, Judge.  Affirmed.

Fuchs & Associates, Inc., John R. Fuchs and Gail S. Gilfillan for Plaintiff, Cross-defendant and Appellant.

Law Offices of William E. Crockett, William E. Crockett, Steven R. Skirvin and Kenneth C. Bounds for Defendant, Cross-complainant and Appellant.

Gaglione, Dolan & Kaplan, Robert T. Dolan and Jack M. LaPedis for Defendants, Cross-defendants and Respondents Eric C. Peterson and Rutter, Hobbs & Davidoff, Inc.

Baker, Keener & Nahra, Mitchell F. Mulbarger and James D. Hepworth for Defendant, Cross-defendant and Respondent Rosslyn Hummer.

Robie & Matthai, Edith R. Matthai, Natalie A. Kouyoumdjian and Marta A. Alcumbrac for Defendants, Cross-defendants and Respondents Hinshaw & Culberton, LLP and Frederick J. Ufkes.

_____

Plaintiff, cross-defendant, and appellant Lisa Du Boise appeals from an order granting three special motions to strike under the anti-SLAPP statute,[1] Code of Civil Procedure section 425.16,[2] and an order awarding attorney fees in favor of defendants, cross-defendants, and respondents Rosslyn Hummer, Frederick J. Ufkes, Eric Peterson, and the law firms of Rutter, Hobbs & Davidoff, Inc. (RHD), and Hinshaw & Culbertson, LLP (H&C), attorneys in this malicious prosecution action. The attorneys represented Rodney Unger in the underlying action to recover funds that he deposited in Du Boise's bank account. On appeal, Du Boise contends: 1) the trial court abused its discretion in making evidentiary rulings; 2) the attorneys lacked probable cause to pursue one or more of the causes of action in the underlying case; and 3) the trial court abused its discretion by awarding excessive attorney fees.

_____

[1] "SLAPP is an acronym for 'strategic lawsuit against public participation.' " (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

[2] All further statutory references are to the Code of Civil Procedure unless otherwise stated.

Unger appeals from the portion of the trial court's order denying his motion for joinder in the anti-SLAPP motions. Unger contends the trial court improperly weighed his credibility and the evidence showed he had the same probable cause as his attorneys to pursue the underlying action.

We conclude Du Boise failed to show that the attorneys lacked probable cause to pursue the causes of action in the underlying case. Du Boise has not shown the evidentiary rulings have an impact on our determination on the merits. The trial court properly exercised its discretion to reduce the attorney fee requests far beyond the amounts incurred and no abuse of discretion has been shown on appeal. Unger's motion for joinder in the anti-SLAPP motions was properly denied, however, because issues of credibility exist that can only be resolved by a finder of fact. Therefore, we affirm the order granting the anti-SLAPP motions and denying Unger's joinder, and we affirm the order awarding attorney fees.

## FACTS AND PROCEDURAL BACKGROUND

### I. Allegations of the Instant Complaint

Du Boise filed a complaint for malicious prosecution against Unger, Hummer, Ufkes, Peterson, RHD, and H&C, containing the following allegations. In August 1998, Allen Gelbard and Robert Beaton formed ABI Investments, LLC (ABI) to hold securities investments. In 1999, Beaton used a portion of ABI's assets to purchase property in Colorado, and Gelbard used a portion to purchase a ranch in Agoura, California. Based on advice that he received, Gelbard had title to the ranch held in ABI's name. Gelbard's son moved to the ranch that year, and Gelbard moved to the ranch in 2001.

In 2003, Unger became ABI's accountant. In 2004, he received one-third ownership of ABI in exchange for a commitment to invest more than $1 million. Unger recorded a lien of $1.1 million against the ranch in the name of his wholly-owned entity Manatee Design Group, Inc. In November 2004, Beaton transferred title to the ranch

from ABI to Unger as a gift, for no consideration, because Unger could get a loan at a lower interest rate than ABI. Unger obtained a loan of $2.5 million for the benefit of ABI secured by a deed of trust to the property.

Gelbard met Du Boise in 2004. In 2005, she moved in with him on the ranch. Beaton and Unger induced Gelbard to file for bankruptcy in October 2005.

In the summer of 2008, Unger was represented by Hummer, Peterson, and RHD. Unger filed an unlawful detainer action against Gelbard and Du Boise. On August 4, 2008, Unger filed the underlying action against Du Boise in federal court for money had and received, breach of fiduciary duty, fraud, conversion, and an accounting. Unger alleged that he had advanced $1.3 million to Du Boise from 2005 to 2007, based on her false promises to use the money to remodel the ranch, but the work had not been completed and Du Boise refused to return the funds. Unger sought $1.3 million from Du Boise.

Gelbard and Du Boise were evicted on October 14, 2008. In 2008, Hummer and Peterson left RHD and began working at H&C. They took their work for Unger with them to H&C. In a motion for partial summary judgment, Unger admitted that most of the communications about the funds were between Gelbard and Beaton. However, he asserted that Gelbard was Du Boise's agent, and Beaton was Unger's agent. Unger withdrew his claims for fraud, breach of fiduciary duty, and accounting, which the trial court dismissed on February 22, 2009.

In 2010, Ufkes associated into the case as trial counsel on Unger's behalf. A jury trial was held from March 9 through 11, 2010. At trial, Unger admitted that he had never communicated with Du Boise in any manner, other than an introduction at a meal in 2005 and a brief greeting while Unger attended a meeting. Unger also admitted that he knew the cost of utilities at the ranch was between $6,000 and $8,000 per month. The evidence showed Unger deposited more than $1 million into Du Boise's account without having any agreement with Du Boise. Du Boise's evidence established the funds were for Gelbard's use and Du Boise was merely a conduit. ABI wrote in its books that the advances were a "loan receivable" from Du Boise. The funds were traceable to the

4

mortgage of $2.5 million and a later mortgage of $3.5 million, secured by the property, which Unger arranged and deposited in his personal account. The evidence showed that Unger never loaned any personal funds to Du Boise.

The jury returned its verdict on March 11, 2010. They found Du Boise did not receive money intended to be used to the benefit of Unger, and Unger did not own, possess, or have the right to possess a specific identifiable sum of money that he transferred to Du Boise. The trial court entered judgment in favor of Du Boise that day. Unger and his attorneys never had any evidence or probable cause to support the claims against Du Boise.

## II. Peterson and RHD's Special Motion to Strike and Supporting Evidence

On May 23, 2011, Peterson and RHD filed an anti-SLAPP motion on the ground that Du Boise could not establish a lack of probable cause to pursue the action or that Peterson acted with malice. The transfer of funds was never at issue. The reasons for the transfer came down to the parties' conflicting explanations.

Peterson submitted his declaration stating the following facts. Peterson worked in RHD's bankruptcy department when Unger contacted him to ask whether Gelbard's bankruptcy stay prevented eviction. Based on Peterson's analysis, RHD's general litigation department successfully pursued eviction. Unger asked RHD to pursue recovery of $1.3 million transferred to Du Boise's account. The second matter was handled by the general litigation department as well, although Peterson was kept informed on the case and assisted in preparing the claims.

Hummer had the lead role in the case against Du Boise. She compiled documents showing dozens of wire transfers by Unger to Du Boise. At the time the claims were prepared, Peterson had not met or spoken with Du Boise. Based on the factual background supplied by Unger, verified by evidence of bank transactions, he had no reason to question that Unger transferred funds to Du Boise or that Unger transferred the funds for rehabilitation of the ranch. He had no reason to question the funds transferred

5

for rehabilitation of the ranch were separate from funds transferred to ABI for other purposes.

Peterson did not prepare the complaint against Du Boise. The federal court had begun requiring electronic filing of documents, but Hummer had not taken the course to allow her to file documents electronically. Peterson reviewed the complaint and the evidence, discussed the contents with the lead attorney assigned to the case and Hummer. Based on this review, Peterson felt the complaint's allegations were supported. Peterson signed the complaint and filed it electronically.

After October 20, 2008, Peterson made no appearances in the case. In June 2009, he transferred to H&C's office in St. Louis, Missouri. Four months later, Hummer accepted a position in H&C's office in Los Angeles. H&C became Unger's exclusive counsel, and RHD ceased to represent Unger. Although some docket entries after October 2008 list Peterson as the filing attorney, H&C support staff simply used Peterson's login information. The actual documents reflect that they were filed by other H&C attorneys.

## III. Ufkes and H&C's Special Motion to Strike and Supporting Evidence

Ufkes and H&C also filed an anti-SLAPP motion on the ground that Du Boise could not establish the attorney defendants lacked probable cause to pursue the underlying action or had filed the complaint with malice. In addition, they argued that the complaint was barred by the defense of unclean hands.

Ufkes submitted his declaration as to the following facts. In January 2010, he was asked to assist Hummer in preparing the case for trial and acting as lead counsel. He never pursued the action with any ill will or improper motive. He did not pursue any cause of action that he knew to be meritless or inconsistent with the facts represented by Unger and the evidence gathered before trial. Shortly before trial, based on conversations with Du Boise's counsel, Ufkes agreed to dismiss Unger's causes of action for fraud,

6

breach of fiduciary duty, and accounting.  He formally dismissed them at a final status conference.

Ufkes and H&C submitted the complaint in the underlying action against Du Boise, as well as evidence from the summary judgment motion and trial, to show that they had probable cause to pursue the causes of action against Du Boise at all times.

### A.  Unger's Underlying Complaint

Unger's complaint against Du Boise, filed in August 2008, for money had and received, breach of fiduciary duty, fraud, conversion and accounting alleged as follows. Unger acquired the ranch from ABI in November 2004.  He owns the property pursuant to a grant deed.  Unger permitted Gelbard to live on the property while it was being refurbished.  Du Boise was Gelbard's personal companion and business associate.  She moved into the property in 2005.  Gelbard and Du Boise purported to assist Unger by facilitating the performance of improvements on the property.  Gelbard requested that Unger provide the funds necessary to pay for refurbishments directly to Du Boise, so Du Boise could pay workmen directly for the work performed on the property.  Du Boise agreed to participate by receiving the funds and using them for the exclusive purpose of funding refurbishments per Unger's directives.  In reliance on the representations that all funds would be used to pay for improvements to the property, Unger began sending funds to Du Boise for that purpose.  Unger listed numerous specific transfers to Du Boise that he made based on requests from Gelbard and Du Boise.  Du Boise and Gelbard made each request directly or with the assistance of Beaton, and each request was represented to Unger as necessary to fund improvements to the property.  Despite this, Du Boise did not use the funds for the exclusive purpose of improving the property.  The funds were used by Du Boise for her own benefit and Gelbard's benefit.  In this manner, Du Boise and Gelbard conspired to defraud Unger.  Gelbard filed a petition for bankruptcy in October 2005.  As a result of Unger's transfers, Du Boise has been unjustly enriched in an amount not less than $1,253,406.

## B. Evidence in Connection with Partial Summary Judgment Motion

Ufkes and H&C also submitted the written letter of agreement dated June 12, 2003, between ABI and Manatee. The agreement stated that ABI, including Beaton and Gelbard, lacked funds to pay the mortgage on the ranch and were in danger of losing the property to foreclosure. Unger agreed to loan $1 million to ABI in order to bring the mortgage on the ranch current, fund renovations in anticipation of selling the ranch as soon as possible, and advance funds for the operating expenses of ABI, Gelbard and Beaton from time to time. ABI agreed to secure Unger's note with a second deed of trust on the ranch and compensate Unger upon sale or refinance of the property. In addition, Unger would be entitled to one third membership interest in ABI. The agreement was signed by Beaton on behalf of ABI and by Unger on behalf of Manatee. An amendment to ABI's operating agreement dated March 18, 2004, and signed by Gelbard and Beaton, gave Unger one-third interest in ABI in consideration of his loans to ABI.

A grant deed dated November 14, 2004, transferred the ranch from ABI to Unger. The grant deed states that it is a bonafide gift and ABI received nothing in return, but also acknowledges receipt of valuable consideration.

Ufkes and H&C submitted Gelbard's October 2005 bankruptcy filing, in which he listed his one third ownership interest in ABI as having no value. He listed ABI as a creditor with a claim of $2.6 million. He also declared that he had no interests in real property. Gelbard testified in his bankruptcy examination that he was not employed for compensation, but was lucky to have a successful girlfriend who paid his expenses.

They submitted a document prepared by Du Boise in November 2006, which itemized extensive work performed on the main residence, the pool cabana, ranch house, horse stalls, and landscaping. General amounts were listed for each category of work. For example, under "landscape," the documents listed payment of $36,731 for soil preparation, equipment rental, purchase and installation of pots, and five outdoor pavilion structures. The total amount listed for maintenance and improvements was $429,078.

Du Boise sent the document to Beaton. In July 2008, Beaton sent the document to Unger, and Unger forwarded it to Hummer.

Ufkes and H&C submitted copies of checks and wire transfers from Manatee to Du Boise's account. In discovery, Unger obtained copies of Du Boise's bank statements showing payments for expenses, including regular debits of $812 by "Jaguar Credit Auto [Payment]," as well as debits by "Daimler Chrysler," Costco, utility companies, TJ Maxx and doctor's offices. They also received copies of the checks written from the account by Du Boise.

## C. Declarations in Support of Summary Judgment Motion and Opposition

Ufkes and H&C submitted Unger's declaration of December 22, 2009, in support of his partial summary judgment motion as to the following facts. When Unger joined ABI, the company's principal asset was the ranch, which ABI intended to renovate and sell for profit. However, ABI did not have the financial resources to prevent foreclosure. Unger agreed to loan ABI money to bring the mortgage current. Upon the sale or refinance of the ranch, it was agreed that all money due to Unger would be paid in full from the proceeds and he would receive one third of the net sales proceeds. Beginning in April 2005, Unger began wiring funds to Du Boise to finance remodeling work. Most of his communications with Du Boise were made through Beaton. Du Boise agreed to use the funds exclusively for remodeling and refurbishment of the ranch. Extensive remodeling projects were planned for the ranch, including repairing and replacing the plumbing, ongoing property clearance, irrigation, landscaping, pool and cabana work, PVC fencing, and repairing and refurbishing the kitchen floors and fixtures. Unger sent funds to Du Boise's account for this purpose, beginning with $20,000 on April 15, 2005. He listed all of the money transfers, for a total of $1,303,406. He asked Du Boise for an accounting, which she sent to Beaton on November 13, 2006. Satisfied that renovations were proceeding, he forwarded more funds for the same purpose. After he gained possession following the eviction, he found that the improvements represented by Du

9

Boise's accounting had not been performed. The ranch had not been remodeled or renovated. Other than the document sent to Beaton, Du Boise has never explained where the money was spent. Du Boise and Gelbard entered the ranch again and Unger evicted them for a second time in early 2009.

Ufkes and H&C also submitted Gelbard's declaration in support of Du Boise's opposition to partial summary judgment. Gelbard explained that to buy the ranch originally, ABI wired funds from Gelbard's share of profits into his former wife's checking account. His wife at the time provided a cashier's check for the deposit of $60,000. He took title in ABI's name as part of an asset protection plan, in the event that he were sued personally as a result of his business transactions and became liable for damages. He disputed several actions taken by Beaton and Unger, including management of ABI funds and books.

He believed that he was the legal owner of the ranch, even though title was in ABI's name. In 2004, Beaton and Unger told him that ABI was out of money. They said Gelbard owed ABI. As a result, unless and until Gelbard could repay ABI, they intended to use the equity in the property to make repairs and improvements to the ranch for the purpose of selling it, and the proceeds would be used to pay off the mortgage and repay ABI any money that Gelbard still owed. Gelbard reluctantly agreed to their proposal.

Gelbard notes Unger received mortgage proceeds of $2.5 million, secured by the ranch. $1.3 million was used to repay the prior mortgage. Gelbard considers the remaining $1.2 million to have been his money or ABI's money. Unger advanced the funds to Gelbard, subject to his express agreement with Beaton that ABI would be reimbursed from a sale or refinance of the ranch. There was no discussion or agreement that Du Boise or Gelbard would have to personally reimburse Unger or ABI for the funds provided to him. He also believes Beaton and Unger asked him to have Du Boise open an account to transfer Gelbard's funds from the equity in the ranch to Gelbard as part of a scheme to defraud him. ABI would provide funds for his business expenses, living expenses and maintenance of the ranch. The funds were not for Du Boise's use. They were never exclusively for repairs and improvements to the ranch. Du Boise was simply

10

a conduit for ABI to make payments to Gelbard for business, personal and property expenses. For example, he requested $17,500 for his divorce attorney in April 2005, and there is a corresponding deposit in Du Boise's account on April 18, 2005.

One of the exhibits attached to Gelbard's declaration was a portion of Unger's deposition taken in October 2006, in a federal case related to potential securities law violations. Gelbard received the deposition testimony in 2007 or 2008. Unger testified that he didn't consider himself to own the ranch. He had a contractual relationship with ABI. The house was in his name, because it gave ABI an advantage in obtaining a lower interest rate and a longer term. Unger had always considered the ranch to be owned by ABI, and had always represented it as such on ABI's books and reported it that way to third parties such as the Internal Revenue Service.

Ufkes and H&C submitted Du Boise's declaration in opposition to partial summary judgment. Du Boise declared that due to Gelbard's severe dyslexia, she assisted him with all of his paperwork in his business and personal affairs. When she moved to the ranch, it was in a state of substantial disrepair as a result of damage to the property by contractors who were under Unger's supervision in 2004. The property required extensive routine maintenance. It was her understanding that Gelbard and Unger discussed the work to be done on the property and the funds to pay for it. Du Boise was not a party to any of the discussions and never entered into any agreement with Unger regarding repairs and improvements to the ranch or the use of funds that were to be provided for such repairs and improvements or any other purpose. All of Du Boise's discussions regarding the use of the fund were with Gelbard. Addressing Unger's assertion in his declaration that discussions and agreements regarding the use of the funds were made through Beaton, Du Boise declared that she never entered into any agreement with Beaton about the repairs and improvements to the ranch or the use of the funds to be provided for repairs and improvements. She denied being party to any agreement to deposit $1.3 million in her bank account to be used solely and exclusively for repairs, maintenance and improvements to the ranch. At Beaton and Unger's suggestion, Gelbard had her open the account so ABI could provide funds to him for business expenses, living

11

expenses and maintenance of the ranch. The funds were never for Du Boise and never exclusively for repairs or improvements to the ranch. She was simply a conduit for ABI to continue making payments to Gelbard.

Du Boise believed any funds advanced to Gelbard for repairs, maintenance and improvements to the ranch came from the equity in the property that was being reinvested in the property. If Gelbard had any debt to ABI when the property was sold, his debt would be paid from the sale proceeds. There was no discussion or agreement with Unger by anyone that Gelbard or Du Boise would be responsible for repaying funds deposited in Du Boise's account. She believes the funds deposited in her account belonged to Gelbard, not Unger or ABI. Also, ABI accounted for the funds in its books and tax returns, which contradicts Unger's claim that he advanced personal funds.

Du Boise noted that bank statements in Unger's possession show payments for utilities. She pointed out checks that she wrote for materials totaling $21,000, and checks she wrote to cash for $59,500, which Gelbard used to pay subcontractors. Unger never asked for receipts. She and Gelbard kept meticulous records of ranch expenditures, but left them at the ranch when they were evicted and Unger has not returned them. She attached "representative" invoices from her contractor brother for work performed on the property. Du Boise asserted that some repairs might not have been obvious to Unger when he inspected in 2008, but other improvements were obvious. Du Boise argued that there were multiple triable issues of fact, including whose funds were placed in the account, whether there was any agreement for the use of the funds, whether the funds were actually transferred to Gelbard, whether funds were in fact used for repairs, maintenance and improvements, and whether there was any agreement for Unger to be repaid by Du Boise.

The trial court denied the motion for partial summary judgment. The minute order states: "[Unger] has not overcome [his] burden of establishing lack of genuine dispute of material facts. [Citation.] Indeed, there is very little, if anything at all, that is undisputed in this case. Most importantly, the formation of the underlying agreement, which is at the core of the lawsuit, is disputed. The agreement is not in writing. The main evidence that

12

[Unger] proffers in support of contract-formation is a self-serving declaration that states the parties entered into an agreement. That declaration is contradicted by another self-serving declaration that [Du Boise] has filed. In essence, in the absence of any concrete evidence to advance either side's position, this case boils down to determining which party is more credible. And that is exclusively in the province of the fact finder and inappropriate for summary judgment. [Unger's] Motion is DENIED."

### D. Testimony at Trial

Ufkes and H&C submitted a portion of Unger's testimony at trial as well. Unger explained that Du Boise had a degree in architecture, connections to wealthy people who might be interested in purchasing the ranch, and her brother was in the construction business. He met with Du Boise at the house to discuss her ideas for improvements. His understanding was that "we" would continue to improve the property while Gelbard and Du Boise lived there and sell it. When Beaton forwarded Du Boise's itemized list of expenditures to him, Unger requested documentation to corroborate the expenses. He never received any receipts to support the figures that Du Boise claimed on her list. After Gelbard and Du Boise were evicted and Unger was able to view the property, he found the floors inside the house had been destroyed, little maintenance had been performed on the exterior, the pool was not functional and the pool deck was destroyed, the landscaping that he expected had been allowed to die or never installed, and the horse stalls and fencing had not been maintained in any way that he could ascertain. It did not appear to Unger that even a fraction of the money that he sent to maintain and improve the ranch had been used for that purpose. The work reflected on Du Boise's list had not been completed. He has never received any receipts for work performed at the ranch.

In addition to amounts deposited in Du Boise's account, Unger also sent between $700,000 and $800,000 to Gelbard. The funds sent to Gelbard were initially advances against his ownership interest in the future profits of the ranch once it was sold. Unger

13

also paid for Gelbard's divorce lawyers, guaranteed the school loan for his daughter, and paid for other personal crises that Gelbard experienced.

Ufkes and H&C submitted Gelbard's trial testimony as well. Gelbard needed $20,000 for a divorce attorney in April 2005. His credit had been destroyed in his divorce and by other matters, so he did not have his own checking account. Unger suggested Gelbard ask Du Boise to open an account in her name to receive money from ABI for Gelbard. Gelbard asked Du Boise to open the account, but did not tell her that it was for ABI to send him money. Gelbard was not a signatory on the account. Du Boise had to take money out for him. When Gelbard needed more money, he asked Beaton for it. He stated that between $600,000 and $800,000 was used to refurbish the property. However, he clarified that by refurbishing, he meant maintenance and repairs. No remodeling took place. There were no permits and there was no contractor. In addition, they spent $300,000 for utilities.

Outside the presence of the jury, before closing arguments, the court told the parties that the verdict could go either way. The court could see Unger coming back with nothing, or with a substantial judgment. The court could not predict which way the "he said, she said" case was going to come out, which the court advised the parties to consider.

## IV. Hummer's Special Motion to Strike and Supporting Evidence

Hummer filed an anti-SLAPP motion on the same grounds as the other defendants, namely, that she had probable cause to pursue the underlying action and Du Boise could not establish the element of malice. Hummer submitted Unger's declarations and evidence from pre-trial proceedings in the underlying case, as well as trial testimony.

Hummer submitted her declaration as to the following facts. In August 2008, a litigation partner at RHD asked her to take over Unger's unlawful detainer action against Gelbard and Du Boise. She learned Unger had separate claims that he wanted to pursue pertaining to money he provided Du Boise to maintain, refurbish and repair the ranch for

14

eventual sale. Hummer spent more than 15 hours reviewing Unger's documents and researching his claims. Unger's records showed that he forwarded funds to Du Boise. His records were substantiated by Du Boise's bank records obtained in discovery. Du Boise also testified at trial that she received funds from Unger. Unger provided Hummer with the written account prepared by Du Boise, which showed that she communicated with him about repairs and refurbishment of the ranch. The records she received from Unger led Hummer to conclude that there was factual support for his claims.

Hummer believed a common count for money had and received was supported by the facts that Unger sent money to Du Boise, which he said was to be used for his benefit as owner of the ranch. She thought a cause of action for conversion was supported by the fact that Unger could identify the funds that he sent Du Boise and she had not used them as he said they had agreed to use them. The accounting cause of action was a remedy to obtain an accounting for the funds that Du Boise admitted receiving from Unger.

Hummer believed a cause of action for breach of fiduciary duty could be based on the facts Unger told her that Du Boise agreed to oversee repairs and held herself out as a trained architect and designer. It was Hummer's understanding that Du Boise presented ideas for improvements when Unger visited the property and had agreed to manage contractors and other personnel who were performing work at the ranch. As part of these responsibilities, Du Boise agreed to be the paymaster and accountant in managing Unger's funds for the repair and refurbishment work at the ranch. In Hummer's view, by agreeing to these responsibilities, Du Boise undertook financial responsibilities toward Unger.

Hummer believed a fraud cause of action was supported by facts that Du Boise promised Unger to use the funds that Unger provided for the benefit of the property by performing repairs and refurbishment to improve the property for eventual sale. Unger continued to give money to Du Boise in reliance on her promise. Later, Unger found that the funds were not used as he intended.

Hummer had not met Du Boise when she filed the complaint. She did not file it with any malice. Based on Hummer's understanding of the facts, as an advocate for

15

Unger, she believed these were viable claims against Du Boise. Approximately one year after the complaint was filed, Hummer left RHD and began working at H&C. Unger's action against Du Boise was transferred to H&C at the same time. In early 2010, Ufkes became Hummer's supervisor and he took the case to trial.

## V. Unger's Joinder Motion

Unger filed a motion for joinder in the anti-SLAPP motions of Ufkes, H&C, Peterson, and RDH. He submitted his declaration as to the following facts. He sued Du Boise to recover more than $1 million that he had sent her for the purpose of improving the ranch. He could not monitor the improvements, because he lives in Colorado. After evicting Gelbard and Du Boise, it was apparent that the money was not spent to improve the ranch. Unger has no malice toward Du Boise and did not prosecute the underlying action for an improper purpose. He relied on his legal counsel as to how best to recoup the money paid to Du Boise which was not used for its intended purpose, and he followed their advice.

## VI. Du Boise's Opposition to the Special Motions to Strike and Supporting Evidence

Du Boise opposed each of the special motions to strike and Unger's joinder.

### A. Opposition to Hummer's Special Motion

Du Boise opposed Hummer's anti-SLAPP motion. All of her arguments concerning the lack of probable cause to pursue the five causes of action were presented under one heading. She argued that Hummer never had probable cause to pursue a fraud claim, because it was undisputed that Unger and Du Boise never communicated with one another about the use of the funds. In addition, no reasonable attorney would have brought a claim for breach of fiduciary duty, because Unger knew the monies he

16

transferred to the account were partnership funds for Gelbard's use, and Gelbard and Unger had expressly agreed Due Boise would merely act as a conduit. Unger knew Du Boise never had any liability for the use of the funds, to account for them or to repay them.

Unger, Hummer, Peterson and RHD had Du Boise's 2006 accounting in their possession two weeks before the complaint was filed, showing $429,078 was used to refurbish the ranch. Du Boise asserted that based on this evidence, Hummer and Peterson should have doubted Unger's statements that none of the monies had been used to refurbish the ranch, that Du Boise had never accounted for the use of the funds, and that Unger was entitled to repayment of the entire amount deposited into the account. Du Boise suggested that Hummer should have written a demand letter and driven by the property to look at it. Hummer should have been suspicious because there was no agreement or representation in writing. She should have doubted Unger's version of the facts, since he lacked documentation to support his story.

Du Boise further argued that even if probable cause existed when the complaint was filed, there was no probable cause to pursue the claims when the attorneys received bank records that showed payments for refurbishment. Du Boise produced hundreds of pages of receipts and invoices showing hundreds of thousands of dollars spent to refurbish the ranch. Hummer and Peterson should have realized from the bank records and receipts that a lawsuit seeking recovery of the full claim could not succeed, and therefore, considered whether the claims were completely without merit. Du Boise also argued that Unger's declaration undermined his claim that Du Boise had to repay the entire amount, because he stated that he had expected to be repaid from the sale proceeds.

Du Boise claimed it was undisputed that Du Boise's attorney asked for evidence to support Unger's claims in December 2009. Hummer admitted that she did not have evidence to support the fraud, breach of fiduciary duty, and accounting claims, because Unger never communicated with Du Boise, so Du Boise could not have made any representations or agreement regarding the use of the funds, obligation to account for them, or to repay. Unger and his attorneys withdrew the claims for fraud, breach of

17

fiduciary duty and accounting, but refused to dismiss them. Du Boise's attorney had to ask the court to dismiss the claims at the pre-trial conference.

Du Boise argued that the conversion claim should not have been brought because it was decided at trial the funds were not Unger's money. Under direct questioning from the court, Unger admitted that they were partnership funds obtained by Unger from loans against the ranch. Du Boise asserted that Hummer and Peterson should have determined the source of the funds before filing the complaint. Upon learning funds did not belong to Unger, no reasonable attorney would have prosecuted a conversion claim.

She argued that the common count for money had and received also failed because the funds did not belong to Unger. No reasonable attorney would have brought the claim, because they could not prove the funds belonged to Unger or were to be used for Unger's benefit. Du Boise also argued that she could establish malice.

## B. Opposition to Ufkes and H&C's Motion to Strike

Du Boise opposed Ufkes and H&C's motion to strike as well. Her arguments were hopelessly muddled, however, as to which attorney should have known what facts. Du Boise made the same arguments that she made in opposition to Hummer's motion in order to establish that Ufkes and H&C lacked probable cause to pursue the five different claims. Du Boise asserted that by the time of trial, in light of evidence from Du Boise, including bank records and Unger's statement that he expected to be repaid from the sale of the ranch, Ufkes and H&C should have examined Unger more closely,

Du Boise also argued that Ufkes failed to submit evidence concerning his knowledge of the facts. Therefore, under an objective standard, he did not show that he had probable cause. She concluded that she had shown a probability of prevailing based on the complete absence of evidence to support the claims asserted against her, "as was finally admitted by Unger at trial," demonstrating that there was no probable cause for one or more of the claims. She argued that she could establish malice without mentioning Ufkes or any evidence pertaining to Ufkes.

## C. Opposition to Peterson and RHD's Motion to Strike

Du Boise made substantially similar arguments in opposition to Peterson and RHD's anti-SLAPP motion as she had made in opposition to the other attorneys' motions. She asserted that Peterson also should have doubted Unger's statements that none of the monies were used to refurbish the ranch, Du Boise had never accounted for the funds, and Unger was entitled to repayment of the entire amount deposited into the account. Once Peterson saw Du Boise's accounting, he should have written a demand letter and driven by the property to look at it. Hummer and Peterson should have realized from the bank records and receipts that a lawsuit seeking recovery of the full amount could not succeed and maybe the claims were totally without merit.

Du Boise also asserted again that her attorney asked Hummer in December 2009 for evidence supporting Unger's claims. Hummer admitted that she did not have evidence to support the fraud, breach of fiduciary duty, and accounting claims, because Unger never communicated with Du Boise, and therefore, Du Boise could not have made any representations or agreement regarding the use of the funds, obligation to account for them, or to repay them. She also argued that she could show malice.

## D. Opposition to Unger's Joinder

Du Boise opposed Unger's joinder in his attorneys' motions to strike. She argued that he had not established a defense based on advice of counsel. He could not show that he fully disclosed all of the relevant facts, because he never communicated with Du Boise or had any agreement with her. Unger knew all of the discussions were held between Gelbard and Beaton. Unger also knew the funds transferred to Du Boise's account were ABI funds for Gelbard's unrestricted use. She argued that malice could be shown as against Unger as well.

19

**E. Evidence in Opposition to Special Motions to Strike and Joinder**

Du Boise submitted several documents in support of her oppositions. In a 27-page declaration, she reiterated many of the statements and conclusions from her previous declarations, as well as the following facts. The underlying action was one of a dozen separate lawsuits, legal proceedings and transactions between Unger, ABI, Gelbard, and Du Boise in the past eight years. Contractors under Unger's supervision caused significant damage to the ranch in 2004 that required extensive repairs. Gelbard and Unger discussed the work that needed to be done and the funds necessary to pay for the repairs. Du Boise's understanding was that Unger told Gelbard to have Du Boise open a bank account to receive Gelbard's partnership payments in order to keep ABI out of Gelbard's divorce. Du Boise acted as a conduit between ABI and Gelbard for the continuation of partnership payments.

Du Boise sent a written accounting to Beaton in November 2006 for amounts totaling $429,078, which Unger, Peterson, Hummer, and RHD received two weeks before filing the underlying complaint. She never made any agreements about the use of the funds. All of her discussions about the funds were with Gelbard, who controlled their use. Her understanding was that the funds provided to Gelbard through her bank account, which were used in Gelbard's sole discretion, came from loans secured by the ranch being reinvested in the property.

Du Boise declared that her bank records, which Unger and his attorneys received in July 2009, showed at least $500,000 of the funds had been used to repair and refurbish the ranch. Specifically, she noted payments for utilities were made from the account in 2006 and 2007. In addition, copies of 21 checks showed payments to entitles that appear to supply labor and materials for repairs and improvements. In late 2009, she produced to Hummer and H&C hundreds of pages of receipts and time sheets that had been in her brother's possession. From these, Gelbard and Du Boise had reconstructed a detailing accounting of $600,000 spent for maintenance, repairs and refurbishment of the ranch.

Based on Du Boise's evidence, Unger, Hummer, Peterson, and H&C knew in December 2009 that there was no communications between Unger and Du Boise, no agreements orally or in writing, no restrictions on the use of the funds by Gelbard, and no obligation to repay the funds because he had expected to be repaid from net proceeds.

In addition to her own declaration, Du Boise submitted Gelbard's 25-page declaration. However, Gelbard did not add any relevant admissible evidence that has not already been described. Du Boise submitted evidence of multiple other lawsuits between the parties as well.

Du Boise submitted a larger portion of Unger's 2006 deposition testimony from the federal securities violations case. Unger stated that ABI owed Manatee approximately $1.1 million. He affirmed that he held legal title to the ranch and that ABI received nothing in return for transferring title to him. ABI transferred title to Unger so that he could use his personal credit to refinance the mortgage at a better interest rate than was offered for commercial loans.

Du Boise also submitted the declaration of her attorney John Fuchs as to the following facts. Fuchs represented Gelbard in his bankruptcy proceeding and another action. Fuchs substituted in to the underlying case to represent Du Boise in December 2009.

On February 1, 2010, he asked Hummer to provide evidence in support of Unger's claims for fraud, breach of fiduciary duty and accounting. Hummer was not able to provide evidence. Hummer admitted that Unger had never communicated with Du Boise, there were no agreements between Unger and Du Boise, and Du Boise never made any representations to Unger about anything. Hummer and H&C withdrew the claims for fraud, breach of fiduciary duty and an accounting. At the pre-conference trial, Ufkes and Hummer informed the trial court that they would be proceeding on two claims only. Fuchs asked the court to dismiss the remaining three claims, which the court did.

At trial, there was no evidence of any representations or promises made by Du Boise to Unger, and no evidence of any agreement between Du Boise and Unger. Unger admitted that he never communicated with Du Boise, except greetings in a social setting.

21

Unger admitted the utility costs for the property were between $6,000 and $8,000 per month, so he was aware that Gelbard had spent approximately $100,000 per year for three years for utilities. The evidence at trial showed ABI booked the advances to Du Boise's account as a "loan receivable" from Du Boise, because the funds belonged to ABI and not Unger. There was no evidence that Du Boise used any funds for her personal purposes, as had been alleged in the complaint. Fuchs also reiterated many facts and conclusions stated previously.

### F. Evidentiary Objections

Du Boise filed objections to the declarations of Hummer, Unger, and Ufkes.

## VII. Pleadings in Reply

Ufkes and H&C filed a reply. They argued that the partial accounting, without receipts, supported Unger's claim that an accounting was required and was clearly inadequate. They also noted that there was no evidence Ufkes or H&C prosecuted the underlying action with malice. They argued that Du Boise's declaration established unclean hands. She admitted that she acted as a conduit for the funds and was aware of Gelbard's bankruptcy and divorce. None of the funds were reported in the bankruptcy or divorce proceedings. Therefore, she is complicit in the scheme to defraud Gelbard's creditors and former wife.

Peterson and RHD filed a reply in which they similarly argued that Du Boise's accounting corroborated Unger's testimony and supported finding probable cause. If Gelbard was entitled to use the funds for any purpose in his discretion, there was no reason to provide an accounting. Moreover, the defendants had no reason to assume the accounting was reliable or accurate. Peterson and RHD noted that as the recipient of the funds, Du Boise was a proper defendant. The fact that Gelbard might have been an additional defendant in the underlying action did not alter that Du Boise was also a

proper defendant.  They asserted that most of the litigation between the parties has been resolved against Gelbard and Du Boise.

Hummer also filed a reply, citing the evidence in support of each cause of action that had been filed and maintained against Du Boise.  Hummer filed 47 pages of objections to Du Boise's declaration.  Ufkes and H&C filed 45 pages of objections to Du Boise's declaration and attached exhibits, and 45 pages of objections to Gelbard's declaration and attached exhibits.  They filed objections to Fuchs's declaration as well.  Peterson and RHD also filed 44 pages of objections to Du Boise's declaration, 37 pages of objections to Gelbard's declaration, and objections to Fuchs's declaration.

## VIII.  <u>Hearing and Further Briefing</u>

A hearing was held on July 28, 2011, on the anti-SLAPP motions and Unger's motion for joinder.  The court issued a tentative ruling focusing on Fuchs's declaration that Hummer admitted having no evidence to support certain causes of action.  Hummer's attorney argued that although the trial court could not weigh or evaluate credibility, Fuchs's declaration was so unbelievable and unsupported by any corroboration, including at trial, that the trial court should disregard it.  Even if the court considered it, probable cause is an objective standard.  Each of the defense attorneys argued similarly.

Fuchs argued that Du Boise was a pawn in the underlying action, and if there had been an action to pursue, it was between ABI and Gelbard.  He also argued that no one requested the accounting transmitted by Du Boise in 2006.  "These were partnership funds, A.B.I. funds.  Mr. Gelbard is a partner.  He has a fiduciary duty to the partnership to account for funds.  This is all he was doing."  He argued that in cross-examination at trial, Unger admitted there were no agreements, there were no representations, and his claims of meetings with Du Boise were false.  He argued that the jury weighed the parties' credibility and concluded Unger was a liar, so the issue is when the attorneys knew he was lying.  He stated that he asked Hummer for evidence of an agreement between Unger and Du Boise, and she had none.  He asked for evidence the money was

23

supposed to be used solely for the ranch and she had none.  Ten days later, three causes of action were withdrawn, although Fuchs had to ask the court to dismiss them.

On August 18, 2011, the trial court ordered a further hearing on the effect of Hummer's admission, as set forth in Fuchs declaration.  Specifically, his declaration that Hummer admitted one month before trial that Unger never communicated with Du Boise, Unger had no agreement with Du Boise, and Du Boise never made any representations to Unger about anything, on the probable cause analysis as to Peterson and Ufkes.

Each of the attorneys filed further briefing.  Du Boise also filed a supplemental brief.  She argued all of the evidence again, including Hummer's admission, as set forth in Fuchs's declaration, that Unger and his attorneys "had neither any documentary evidence nor any credible testimony, to show any agreement with Du Boise, any representations by her to Unger or any basis for a fiduciary duty by her to Unger."  She asserted that Hummer's admission was confirmed in correspondence between Hummer and Fuchs.  Du Boise argued that Peterson and Ufkes were jointly and severally liable, because Hummer, as an attorney of record in the underlying action, was an authorized agent for them and both law firms.  She recited facts to support finding agency.

Du Boise argued that the defendant's reliance on Unger's statements at trial concerning his agreement with Du Boise and representations regarding the use of the funds simply created a factual dispute as to their knowledge before filing and during prosecution of the action, because of the testimony of other witnesses and the documents in their possession showed that Unger's statements were untrue.

Du Boise submitted a supplemental declaration asking the court to take judicial notice of the entire trial transcript in the underlying action.  Unger testified that he met with Du Boise two or three times and discussed her ideas for remodeling the house.  Unger admitted that a statement in his declaration that he asked Du Boise for an accounting was in error, because he would have asked Gelbard.  His dealing were primarily with Gelbard.  Gelbard would request Unger put money into Du Boise's account.  Unger signed Du Boise's name on the backs of checks to deposit them in Colorado into her account.  Du Boise did not authorize him to sign her name and he did

not contact her in any way to tell her the amount put in the bank. Unger testified that it was the fastest way to get money to them.

Du Boise testified that she wrote checks for cash from her account at Gelbard's request. Gelbard directed the use of the funds. Gelbard testified that Unger asked him to ask Du Boise to open a bank account to receive funds. Gelbard asked her, and Du Boise opened the account. Gelbard did not tell Du Boise the purpose for opening the account. Gelbard would call Beaton or Unger to request funds, which Unger deposited in Du Boise's account. He had no oral agreement or understanding with Unger that the funds would be used solely to repair and refurbish the ranch. He understood the funds were from ABI. Gelbard was not a signatory on the bank account. Du Boise had to take the money out. He directed Du Boise to withdraw cash and write checks to pay his attorney. Gelbard testified that certain plumbing installation work that was done would not have been visible after it was completed. Cash taken out of the account was used almost entirely to pay labor costs. In January 2006, Gelbard and Unger had a falling out. After that, Gelbard requested funds from Beaton.

Du Boise also submitted an unwieldy, verbose 25-page supplemental declaration by Fuchs. As to the particular conversation at issue, Fuchs carefully declared that Hummer admitted she had "no documentary evidence" in support of at least three claims against Du Boise. Fuchs provided letters, pleadings and other documents which he claimed confirmed Hummer's admission. However, the vast majority of the letters were authored by Fuchs and made the same claims Du Boise had made throughout the underlying action. In fact, Hummer sent a letter on December 18, 2009, in which she stated, "I do not believe further discussions with you about the motion [for partial summary judgment] will be fruitful as I doubt you will be able to convince me, as you tried at length yesterday, that Rodney Unger's claims are without merit or that a motion is not warranted."

In a letter dated February 1, 2010, Fuchs noted after reviewing Hummer's contentions for trial, "it appears that you decided in early January to drop two more of the five claims . . . . However, it now appears that you withheld that information at the time

25

of our face-to-face pretrial meeting on January 20th." A series of settlement demands are exchanged. Hummer advocates Unger's position and does not suggest in any way that there is no evidence to support Unger's claims. In a letter dated February 9, 2010, Fuchs states, "Here, you have now admitted that you never had any evidence to support three claims that have now been withdrawn and should be dismissed."

In a confidential settlement conference brief dated February 11, 2010, Fuchs explains that he asked Hummer on January 20th, 2010, "to explain Unger's evidence of an <u>express</u> agreement between the parties requiring that the funds transferred to Ms. Du Boise were to be used <u>exclusively</u> to repair and refurbish the Ranch. [¶] After 18 months of prosecuting this action based on such an <u>express</u> agreement, Hummer admitted that there was no such agreement between Unger and Ms. Du Boise, and that Unger's assertion of an express agreement was based on statements Ms. Du Boise allegedly made to Gelbard, who allegedly made statements to Beaton, who allegedly made statements to Unger, regarding the alleged exclusive use of the funds for the Ranch. I advised Ms. Hummer that these alleged statements constituted triple hearsay and were unlikely to be admissible. She responded by claiming that Beaton and Gelbard were agents of their principals, which she asserts is an exception to the hearsay objection. Unfortunately for Hummer, since she never took the depositions of either Ms. Du Boise or Gelbard, they will testify that there was no such agreement, and that the funds transferred by Unger to Ms. Du Boise, actually belonged to Gelbard and were provided to him for his personal and business expenses by ABI, as a continuation of such transfers that had been occurring since 1999."

"I also asked Hummer for her evidence of fraud and breach of fiduciary duty, but she was unable to detail any specific representations by Ms. Du Boise to Unger, or concealment of material facts from Unger, since these parties met on no more than two or three occasions and never spoke to each other regarding these funds or any other substantive topic. I also asked Hummer to explain the basis for the breach of fiduciary duty claim against Ms. Du Boise, since there was no relationship between Unger and Ms.

26

Du Boise, let alone a fiduciary one. She could not provide me with any evidence of a fiduciary relationship, which is also required for Unger's accounting claim."

In a letter to Hummer dated March 1, 2010, among other issues, Fuchs states, "When we first entered this case, you stated to me that there was 'an agreement' between Unger and Du Boise that the funds deposited into her account would be used exclusively to repair and refurbish the Ranch. When I asked for a copy of that 'agreement,' you admitted that it was an oral agreement, and when I asked you to identify the parties to the agreement, you claimed that it was between Robert Beaton and Allen Gelbard [], and you claimed that each of them was acting as an agent for their principals. We vehemently disagree, and we assert that there was never any such agreement."

Peterson and RHD filed objections to the declarations of Du Boise and Fuchs. Hummer joined in the objections. Ufkes and H&C filed evidentiary objections as well.

A hearing was held on September 9, 2011. Defendants argued that Fuchs's supplemental declaration clarified his earlier declaration. The court noted the implication of Fuchs's original declaration was that Hummer believed Unger's testimony was false. An attorney who appeared in place of Fuchs at the hearing argued that Fuchs's original declaration had not been limited to documentary evidence, but encompassed all evidence. The trial court took the matter under submission.

On October 3, 2011, in a 31-page minute order, the court ruled expressly on the parties' objections. The court granted the special motions to strike of Peterson, RHD, Hummer, Ufkes, and H&C. The court denied Unger's special motion to strike by way of joinder.

Du Boise filed a motion for clarification, reconsideration or a limited discovery order. Du Boise noted Unger had filed a cross-complaint for indemnification against his attorneys. She argued that limited discovery should have been ordered. She filed another declaration by Fuchs in support of her motion. Hummer opposed the motion for reconsideration and filed objections to Fuchs's declaration. Peterson and RHD opposed the motion, requested sanctions, and filed evidentiary objections. Ufkes and H&C opposed the motion as well. Each submitted documents and reporter's transcripts as

27

well. Du Boise filed a reply arguing that the cross-complaint presented new facts. A hearing on the motion for clarification was held on November 16, 2011. The court denied the motion. Du Boise and Unger each filed a timely notice of appeal from the court's order granting the attorneys' anti-SLAPP motions and denying Unger's motion for joinder.

## DISCUSSION

### I. Standard of Review and Analytical Framework

"In deciding an anti-SLAPP motion, the trial court must 'engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)" (*Johnson v. Ralphs Grocery Co.* (2012) 204 Cal.App.4th 1097, 1103 (*Johnson*).) The first step is not disputed in this case, because the anti-SLAPP statute applies to malicious prosecution claims. (*Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 214-215 (*Daniels*).)

"'[T]o establish a probability of prevailing on the claim [citation] . . . , the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant [citation]; though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.)" (*Johnson, supra,* 204 Cal.App.4th at p. 1105.)

28

"'[A]lthough by its terms section 425.16, subdivision (b)(1) calls upon a court to determine whether "the plaintiff has established that there is a *probability* that the plaintiff will prevail on the claim" (italics added), past cases interpreting this provision establish that the Legislature did not intend that a court, in ruling on a motion to strike under this statute, would weigh conflicting evidence to determine whether it is more probable than not that plaintiff will prevail on the claim, but rather intended to establish a summary-judgment-like procedure available at an early stage of litigation that poses a potential chilling effect on speech-related activities.' [Citation.] '[T]he court's responsibility is to accept as true the evidence favorable to the plaintiff . . . .' [Citation.] '[T]he defendant's evidence is considered with a view toward whether it defeats the plaintiff's showing as a matter of law, such as by establishing a defense or the absence of a necessary element.' [Citation.]" (*Daniels, supra,* 182 Cal.App.4th at p. 215.)

"We review an order granting an anti-SLAPP motion de novo, applying the same two-step procedure as the trial court. [Citation.] We look at the pleadings and declarations, accepting as true the evidence that favors the plaintiff and evaluating the defendant's evidence '"only to determine if it has defeated that submitted by the plaintiff as a matter of law." [Citation.]' [Citation.] The plaintiff's cause of action needs to have only '"minimal merit" [citation]' to survive an anti-SLAPP motion. [Citation.]" (*Cole v. Patricia A. Meyer & Associates, APC* (2012) 206 Cal.App.4th 1095, 1105 (*Cole*).)


## II. Evidentiary Rulings


On appeal, Du Boise contends that the trial court erred in overruling her objections and sustaining objections made by the respondents. However, her contention misapplies the principle that the court views the evidence in the light most favorable to the plaintiff. For example, her own testimony that she had no agreement with Unger does not contradict the fact that Unger told his attorneys something different. The trial court properly overruled the objections that Du Boise made on this basis. Moreover, Du Boise has failed to show any prejudice as a result of the trial court's evidentiary rulings. Even

29

were we to consider evidence that Du Boise contends should have been admitted, it does not alter our conclusions in this case set forth below.

## III.  Malicious Prosecution

Du Boise contends she made a prima facie evidentiary showing that the attorneys lacked probable cause to prosecute the claims in Unger's underlying action.  We disagree.

### A.  General Principles

"To establish a cause of action for malicious prosecution, a plaintiff must prove that the underlying action was (1) terminated in the plaintiff's favor, (2) prosecuted without probable cause, and (3) initiated with malice.  (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 965.)"  (*Silas v. Arden* (2012) 213 Cal.App.4th 75, 89-90.)

"In analyzing the issue of probable cause in a malicious prosecution context, the trial court must consider both the factual circumstances established by the evidence and the legal theory upon which relief is sought."  (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 164–165 (*Sangster*).)  "Probable cause exists when a lawsuit is based on facts reasonably believed to be true, and all asserted theories are legally tenable under the known facts.  [Citation.]"  (*Cole, supra,* 206 Cal.App.4th at p. 1106.)  A litigant lacks probable cause for her action if she relies on facts which she has no reasonable cause to believe are true or seeks recovery based on a legal theory which is untenable under the facts known to her.  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 292 (*Soukup*).)  "This objective standard of review is similar to the standard for determining whether a lawsuit is frivolous:  whether 'any reasonable attorney would have thought the claim tenable . . . .'  (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 885-886 (*Sheldon Appel*).)"  (*Cole, supra,* at p. 1106.)

"The tort of malicious prosecution also includes the act of 'continuing to prosecute a lawsuit discovered to lack probable cause.' [Citation.] In determining the probable cause issue, the same standard applies 'to the continuation as to the initiation of a suit.' [Citation.]" (*Kleveland v. Siegel & Wolensky, LLP* (2013) 215 Cal.App.4th 534, 551.) "Probable cause, moreover, must exist for every cause of action advanced in the underlying action. '[A]n action for malicious prosecution lies when but one of alternate theories of recovery is maliciously asserted . . . .' (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 57, fn. 5 [(*Bertero*)]; see *Crowley v. Katleman* (1994) 8 Cal.4th 666, 679, 695.)" (*Soukup, supra,* 39 Cal.4th at p. 292.)

"This element requires the trial court to make an objective call as to the reasonableness of the defendant's conduct; that is, to determine whether, on the facts known to defendant, institution of the prior action was legally tenable. If the prior action was objectively reasonable, the malicious prosecution claim will fail. (*Sheldon Appel, supra,* 47 Cal.3d at pp. 878-879.)" (*Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1153 (*Sierra Club Foundation*).)

To determine whether the underlying action was legally tenable, "the trial court must construe the allegations of the underlying complaint liberally in a light most favorable to the malicious prosecution defendant." (*Sangster, supra,* 68 Cal.App.4th at p. 165.)

"'Probable cause is a low threshold designed to protect a litigant's right to assert arguable legal claims even if the claims are extremely unlikely to succeed. . . . "This rather lenient standard for bringing a civil action reflects 'the important public policy of avoiding the chilling of novel or debatable legal claims.' (*Id.* at p. 885.) Attorneys and litigants . . . '"have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win . . . ."' (*Ibid.,* quoting *In re Marriage of Flaherty* [(1982)] 31 Cal.3d [637,] 650.) Only those actions that '"any reasonable attorney would agree [are] totally and completely without merit"' may form the basis for a malicious prosecution suit. (*Ibid.*)" [Citation.]' [Citation.]" (*Mendoza v. Wichmann* (2011) 194 Cal.App.4th 1430, 1449.)

""[P]robable cause is lacking 'when a prospective plaintiff and counsel do not have evidence sufficient to uphold a favorable judgment or information affording an inference that such evidence can be obtained for trial.'"" [Citations.] "'In a situation of complete absence of supporting evidence, it cannot be adjudged reasonable to prosecute a claim.'" ([*Soukup, supra,*] 39 Cal.4th [at p.] 292.)" (*Daniels, supra,* 182 Cal.App.4th at p. 223.)

"As well, absence of probable cause can be shown by proof that the initiator commenced the prior action knowing that his or her claims were false. ([*Bertero*], *supra,* 13 Cal.3d at p. 50.) . . . Probable cause does not depend on the defendant's subjective evaluation of the legal merits of the prior action. But if defendant *knows* that the facts he or she is asserting are not true, then defendant's knowledge of facts which would justify initiating suit is zero, and probable cause is nonexistent." (*Sierra Club Foundation, supra,* 72 Cal.App.4th at pp. 1153-1154.)

"In general, a lawyer 'is entitled to rely on information provided by the client.' [Citation.] If the lawyer discovers the client's statements are false, the lawyer cannot rely on such statements in prosecuting an action. [Citations.] But a letter from a litigation adversary merely suggesting it disagrees with the verity of the allegations in the lawsuit is not sufficient to put the lawyer on notice of the falsity of the client's allegations. [Citations.]" (*Daniels*, *supra*, 182 Cal.App.4th at p. 223.)

"The question of probable cause is one of law, but if there is a dispute concerning the defendant's knowledge of facts on which his or her claim is based, the jury must resolve that threshold question. It is then for the court to decide whether the state of defendant's knowledge constitutes an absence of probable cause. (*Sheldon Appel, supra,* 47 Cal.3d at pp. 879-881; *Axline v. Saint John's Hospital & Health Center* (1998) 63 Cal.App.4th 907, 917.)" (*Sierra Club Foundation, supra,* 72 Cal.App.4th at p. 1154.)

## B. Fraud

Du Boise contends she established a prima facie case that the attorneys lacked probable cause to file and pursue the cause of action for fraud against her.  Based on the evidence submitted, we cannot agree.

"The well-known elements of a cause of action for fraud are:  (1)  a misrepresentation, which includes a concealment or nondisclosure; (2)  knowledge of the falsity of the misrepresentation, i.e., scienter; (3)  intent to induce reliance on the misrepresentation; (4)  justifiable reliance; and (5)  resulting damages.  [Citation.]" (*Cadlo v. Owens-Illinois, Inc.* (2004) 125 Cal.App.4th 513, 519.)

In this case, there was evidence that Du Boise made representations to Unger, and Gelbard made representations on behalf of himself and Du Boise, acting as her actual or ostensible agent.  "An agent is one who represents another, called the principal, in dealings with third persons."  (Civ. Code, § 2295.)  Agency may be actual or ostensible. (*Id*., § 2298.)  Actual agency exists "when the agent is really employed by the principal." (*Id*., § 2299.)  "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him."  (*Id.*, § 2300.)  An agent has the authority that the principal, actually or ostensibly, confers on him.  (*Id.*, § 2315.)

"'[O]stensible authority arises as a result of conduct of the principal which causes *the third party* reasonably to believe that the agent possesses the authority to act on the principal's behalf.'  [Citation.]  'Ostensible authority may be established by proof that the principal approved prior similar acts of the agent.'  [Citation.]  '"[W]here the principal knows that the agent holds himself out as clothed with certain authority, and remains silent, such conduct on the part of the principal may give rise to liability.  [Citation.]" [Citation.]'  [Citations.]"  (*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 426-427.)

Ostensible agency, "'may be implied from the facts of a particular case, and if a principal by his acts has led others to believe that he has conferred authority upon an

agent, he cannot be heard to assert, as against third parties who have relied thereon in good faith, that he did not intend to confer such power . . . . An agent's authority may be proved by circumstantial evidence[.]' [Citation.]" (*Tomerlin v. Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 644.)

The cause of action for fraud in the underlying case alleged that Du Boise represented she would use funds deposited in her account for improvements to the property. These allegations were supported by Unger's testimony and multiple documents. Unger testified consistently that he met with Du Boise to discuss improvements to the property and had an agreement with her to deposit money in her bank account to pay for improvements. Discussions about the arrangement also took place through Beaton and Gelbard. In fact, Gelbard admitted by declaration and at trial that he discussed improvements to the property with Unger at one point and arrangements to fund the improvements.

It is also clear an agreement was in fact entered into between Unger and Du Boise. Du Boise agreed to open a bank account and accept deposits arranged by Unger. She either made this agreement directly with Unger, or she allowed Gelbard to make the agreement as her agent. If Gelbard did not have actual authority to make representations and enter into the agreement on her behalf, then he acted as her ostensible agent. Du Boise was aware of the representations and the agreement that she would open an account to accept deposits. By opening the account and facilitating the use of the funds, Du Boise allowed third parties to believe Gelbard was authorized to enter into an agreement for the funds on her behalf.

According to Unger, the agreement included the condition that Du Boise and Gelbard would spend the funds solely on maintenance and improvements to the ranch property. Unger would recoup the funds when the property was sold, and the net proceeds would be divided in thirds.

Unger's consistent statements about the parties' agreement were supported by documentary evidence. Title to the ranch was in Unger's name, Unger was responsible for the mortgage on the property, and bank records showed Unger deposited hundreds of

34

thousands of dollars into Du Boise's account. Du Boise provided a cursory accounting for a portion of the money used for maintenance and improvements, which supported Unger's statements that the money was intended for maintenance and improvements. In discovery, the attorneys obtained Du Boise's bank statements showing a significant portion of the funds were used for purposes unrelated to property improvements.

Du Boise argues the attorneys should have known the cause of action was untenable, because her accounting and bank records established that some of the funds were spent on improvements. However, the bank records clearly showed that funds were used for purposes other than property improvements. The fact that some money was used for a proper purpose did not mean Unger did not have a claim for the remainder of the funds.

At all times, Unger claimed the parties' agreement allowed him to recover the funds advanced for improvements from the sale of the property, after which any profits would be divided equally among the partners. This supported his claim that he advanced the funds personally, rather than from partnership funds. Any reasonable attorney would have considered a cause of action for fraud to be legally tenable based on Unger's statements and the documentary evidence.

Du Boise did not challenge the specificity of the fraud allegations by way of demurrer or narrow the claim through discovery responses. Du Boise submitted no evidence from which reasonable attorneys would agree the cause of action for fraud lacked merit. The attorneys were not required to accept Gelbard and Du Boise's statements that they had complete discretion to use the funds as they chose. The documentary evidence did not support their version of the facts. Unger's declaration in a prior action that ABI owned the property did not conflict with his statements that he deposited personal funds in Du Boise's account and was entitled to repayment of those funds when the improved property was sold. Unger's agreement to accept repayment from sale proceeds did not mean that if funds were siphoned off and used for unauthorized purposes he would have no recourse. There was no evidence from which the attorneys should have concluded that Unger was not truthful when he said the

35

payments to Du Boise's account were solely for improvements or that he was entitled to reimbursement of those funds.

On appeal, Du Boise does not rely on her attorney's declaration that Hummer admitted there was no agreement between Unger and Du Boise. Fuchs's supplemental declaration limited Hummer's admission to a lack of documentary evidence of any agreement between Unger and Du Boise, which has never been in dispute anyway.

## C. Breach of Fiduciary Duty

Du Boise contends that her evidence showed the attorneys lacked probable cause to prosecute Unger's cause of action for breach of fiduciary duty as well. We disagree.

"The elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) its breach, and (3) damage proximately caused by that breach. [Citations.]" (*Mendoza v. Continental Sales Co.* (2006) 140 Cal.App.4th 1395, 1405 (*Continental Sales Co.*).) "'An agency relationship is a fiduciary one, obliging the agent to act in the interest of the principal. [Citation.]' [Citation.]" (*Ibid.*)

In this case, Unger consistently stated that Du Boise and Gelbard agreed to use the funds deposited in Du Boise's account for repairs and improvements to the property. According to Unger, Du Boise and Gelbard agreed to manage the work and pay contractors and other laborers from the funds. Du Boise's own evidence revealed that Unger had previous contractors working on the property in 2004 who caused extensive damage. A reasonable attorney could conclude that Du Boise agreed to act as Unger's agent in overseeing the repairs and improvements and took on fiduciary duties with respect to the money he provided for the work. There was evidence to support filing the cause of action for breach of fiduciary duty, and Unger withdrew this particular claim before trial.

36

**D. Accounting**

Du Boise contends that the attorneys lacked probable cause to pursue the cause of action for an accounting. This is clearly incorrect.

"A cause of action for an accounting requires a showing that a relationship exists between the plaintiff and defendant that requires an accounting, and that some balance is due the plaintiff that can only be ascertained by an accounting. [Citations.] [¶] An action for accounting is not available where the plaintiff alleges the right to recover a sum certain or a sum that can be made certain by calculation. [Citation.] A plaintiff need not state facts that are peculiarly within the knowledge of the opposing party. [Citation.]" (*Teselle v. McLoughlin* (2009) 173 Cal.App.4th 156, 179 (*Teselle*).)

"[A] fiduciary relationship between the parties is not required to state a cause of action for accounting. All that is required is that some relationship exists that requires an accounting. [Citation.] The right to an accounting can arise from the possession by the defendant of money or property which, because of the defendant's relationship with the plaintiff, the defendant is obliged to surrender. [Citation.]" (*Teselle*, *supra*, 173 Cal.App.4th at pp. 179-180.)

"However, the nature of a cause of action in accounting is unique in that it is a means of discovery. An accounting is a 'species of disclosure, predicated upon the plaintiff's legal inability to determine how much money, if any, is due.' [Citation.] Thus, the purpose of the accounting is, in part, to discover what, if any, sums are owed to the plaintiff, and an accounting may be used as a discovery device. [Citation.]" (*Teselle*, *supra*, 173 Cal.App.4th at p. 180.)

In this case, Unger testified consistently by declaration and at trial that he transferred funds to Du Boise's bank account to be used for improvements. In 2006, Du Boise provided a partial accounting for the funds that she represented were used for maintenance and improvements, but the expenditures were listed in very general terms and not supported by documentation. Any reasonable attorney would conclude from this evidence that Unger was entitled to a complete accounting of the funds that he transferred

37

to Du Boise. The attorneys were entitled to rely on Unger's statements, which were supported by the documents in this case. Du Boise did not submit any evidence to show that the attorneys were aware that Unger's statements were false.

### E. Conversion

Du Boise also contends that the attorneys lacked probable cause to file and maintain the cause of action for conversion. This is incorrect.

"'Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. Conversion is a strict liability tort. The foundation of the action rests neither in the knowledge nor the intent of the defendant. Instead, the tort consists in the breach of an absolute duty; the act of conversion itself is tortious. Therefore, questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial. [Citations.]'" (*Continental Sales Co., supra,* 140 Cal.App.4th at pp. 1404-1405, citing *Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1066.)

It was undisputed that Unger transferred funds to a bank account that Du Boise opened for that purpose. Unger consistently testified that the funds were intended to maintain and improve the ranch, but the money was not used for its intended purpose. Du Boise opened the account, received the funds, and wrote the checks to use the funds. Du Boise's bank records showed that she used funds for purposes other than improvements, such as car payments and doctors' bills. Unger's claims were supported by the bank records and Du Boise's partial accounting. If Du Boise used funds for purposes other than those to which the parties agreed, then by law, Unger was entitled to recover the funds that Du Boise converted to her own uses. Unger's cause of action was viable even if Du Boise showed that she used a portion of the funds for improvements and accounted for those expenditures. Du Boise's evidence would simply reduce the

amount of damages that Unger could recover. A reasonable attorney would find a cause of action for conversion legally tenable based on Unger's testimony and the documentary evidence supporting his statements. Du Boise did not establish otherwise.

### F. Money Had and Received

Du Boise similarly contends that Unger's attorneys lacked probable cause to file and prosecute Unger's claim for money had and received. We disagree.

"'A common count is not a specific cause of action . . . ; rather, it is a simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness, including that arising from an alleged duty to make restitution under an assumpsit theory.' [Citations.] 'Although such an action is one at law, it is governed by principles of equity . . . .' [Citation.]" (*Avidor v. Sutter's Place, Inc.* (2013) 212 Cal.App.4th 1439, 1454 (*Avidor*).)

"'A cause of action for money had and received is stated if it is alleged [that] the defendant "is indebted to the plaintiff in a certain sum 'for money had and received by the defendant for the use of the plaintiff.'"' [Citations.] The claim is viable "'wherever one person has received money which belongs to another, and which in equity and good conscience should be paid over to the latter."' [Citations.] As juries are instructed in [Judicial Council of California Civil Jury Instructions (2011-2012)] CACI No. 370, the plaintiff must prove that the defendant received money 'intended to be used for the benefit of [the plaintiff],' that the money was not used for the plaintiff's benefit, and that the defendant has not given the money to the plaintiff." (*Avidor*, *supra*, 212 Cal.App.4th at p. 1455.)

In this case, Unger consistently stated that he provided funds to Du Boise for maintenance and improvement of the ranch. He would recover the funds he paid when the ranch was sold. Instead of using all of the funds to improve the property, which would attract a buyer and increase the sales price, Du Boise siphoned funds for other purposes that did not benefit Unger or the property. A reasonable attorney could file and

maintain a common count for money had and received based on these facts. Du Boise did not provide any evidence to refute Unger's version of the facts, other than her and Gelbard's testimony.

The attorneys were entitled to rely on Unger's testimony. His testimony was supported, not contradicted, by the bank records, title deed, the mortgage documents, and the partial accounting. An opposing party's testimony to a different version of the facts does not mean that the attorneys should have concluded Du Boise was truthful and Unger was not. The trial court properly granted the attorneys' anti-SLAPP motions on the ground that Du Boise failed to show a lack of probable cause.

### G. Malice

Since we conclude Du Boise failed to show the attorneys lacked probable cause to prosecute the action against her, we do not need to consider whether Du Boise also failed to establish the element of malice.

### H. Unger's Motion for Joinder

Unger appeals from the trial court's ruling denying his motion for joinder in the anti-SLAPP motions of the attorneys. He contends that he had the same probable cause as his attorneys to pursue the underlying action. This is incorrect.

The attorneys were entitled to rely on Unger's statements that he supplied funds to Du Boise's account and there was an agreement to use those funds solely for repairs and improvements to the property. There was no evidence from which the attorneys should have concluded Unger's statements were false, and the attorneys were not required to credit the contrary statements of opposing parties and counsel.

However, Du Boise and Gelbard stated the funds did not belong to Unger and there was no agreement to use the funds for any specific purpose. In other words, they accused Unger of lying about the parties' agreement. Under these circumstances,

40

Unger's contrary statements about the parties' agreement cannot establish probable cause as a matter of law. The causes of action were legally tenable based on the facts that Unger asserted. However, if Unger knew the facts he was asserting were not true, then he had no knowledge of facts to justify his claims and he lacked probable cause. Because there is a dispute concerning Unger's knowledge of the facts on which his claim was based, the jury must resolve that threshold question.

## IV. <u>Attorney Fees</u>

Du Boise also contends the trial court abused its discretion in awarding attorney fees following the order granting the anti-SLAPP motions. We disagree.

### A. Attorney Fee Proceedings in the Trial Court

On November 15, 2011, Hummer filed a motion for an award of attorney fees of $34,467.62. Du Boise opposed the motion on several grounds, including the attorney time was inflated and the amount should be reduced to no more than $10,000. Peterson and RHD filed a motion seeking attorney fees of $26,099.53. Du Boise similarly argued their fee request should be reduced to no more than $10,000. Ufkes and H&C filed a motion seeking attorney fees of $99,262.50. Du Boise opposed their motion by arguing the matter was overstaffed and the time invested was inflated. Du Boise argued the trial court should exercise its discretion to deny Ufkes and H&C's fees entirely, or reduce their fees to no more than $10,000. In reply, Ufkes and H&C's attorney, Marta Alcumbrac, provided details about the number of boxes of documents that had to be reviewed to prepare the motion.

A hearing was held on February 7, 2012. The trial court provided a tentative ruling to award the following amounts as attorney fees: $10,800 to Peterson and RHD, $25,000 to Hummer, and $25,000 to Ufkes and H&C. Alcumbrac explained that her firm had custody of the documents in the case, including 27 boxes of documents from the

underlying proceedings and related litigation from RHD. In order to prevent duplication, her firm agreed with the other defense counsel to do the majority of the work. The court stated the attorneys' billing records and declarations were inadequate. The billing records were so severely redacted that the court could not review each item to determine the efficacy of the work. The court stated the arguments made at the hearing might have changed the amount of the fee award if they had been properly presented in the original motion, and the amount awarded for the work performed might have been higher if the redactions had not been so numerous. The court had not been able to find information about the work performed. Since the court could not determine whether there had been duplication, the court refused to guess. The court compared the work in this case to the work in other cases. The court noted, "[A]ll I can say is that I had a sense that more was done and probably more was awardable, but I can't tell that from [] the declaration that I received in the [H&C motion], because it was so general[.]" The court issued a 10-page minute order analyzing the fee motions. The court awarded fees in accordance with the tentative ruling: $10,800 to Peterson and RHD, $25,000 to Hummer, and $25,000 to Ufkes and H&C. Du Boise filed a notice of appeal from the order awarding attorney fees.

## B. Standard of Review

Section 425.16, subdivision (c)(1), provides, in pertinent part, "a prevailing defendant on a[n anti-SLAPP motion] shall be entitled to recover his or her attorney's fees and costs." "'The language of the anti-SLAPP statute is mandatory; it requires a fee award to a defendant who brings a successful motion to strike. Accordingly, our Supreme Court has held that under this provision, "any SLAPP defendant who brings a successful motion to strike is *entitled* to *mandatory* attorney fees." [Citation.]' [Citation.] At the same time, 'a defendant who brings a successful special motion to strike is entitled only to reasonable attorney fees, and not necessarily to the entire amount

requested.  [Citations.]'  [Citation.]  We review the trial court's ruling for abuse of discretion.  [Citation.]"  (*G.R. v. Intelligator* (2010) 185 Cal.App.4th 606, 620.)

"A trial court's exercise of discretion concerning an award of attorney fees will not be reversed unless there is a manifest abuse of discretion.  (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.)  '"The 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong[']—meaning that it abused its discretion.  [Citations.]"'  (*Ibid.,* citing *Serrano v. Priest* (1977) 20 Cal.3d 25, 49 . . . .)"  (*Nichols v. City of Taft* (2007) 155 Cal.App.4th 1233, 1239.)

## C.  Analysis

Du Boise contends the trial court abused its discretion by not reducing the fee awards even further.  We disagree.  It is clear from the record in this case that the attorneys spent far more time preparing and arguing the motions than is reflected in the fee awards.  Du Boise's opposition papers were lengthy, required review of documents in numerous legal matters, misapplied key legal principles, and generated an additional round of supplemental briefing and argument.  The trial court was in the best position to assess the value of the legal work and substantially reduced the amount of the fees requested.  We find no abuse of discretion in the amounts awarded.

## DISPOSITION

The order granting the anti-SLAPP motions and denying Unger's motion for joinder is affirmed, as is the order awarding attorney fees.  Rosslyn Hummer, Frederick J. Ufkes, Eric Peterson, Rutter, Hobbs & Davidoff, Inc., and Hinshaw & Culbertson, LLP are awarded their costs on appeal as against Lisa Du Boise with respect to the anti-

SLAPP rulings and attorney fees awards.  Lisa Du Boise is awarded her costs on appeal as against Rodney Unger with respect to his appeal concerning the motion for joinder.


KRIEGLER, J.


We concur:


TURNER, P. J.


MOSK, J.